2014 VT 65

## Jasmin LeBlanc v. Daniel LeBlanc

[100 A.3d 345]

No. 12-420

Present: Reiber, C.J., Dooley, Skoglund and Robinson, JJ., and Crawford, Supr. J., Specially Assigned

Opinion Filed June 27, 2014

18

*Bryce Breton* of *Breton & Simon, PLC*, Stowe, for Plaintiff-Appellant.

*Daniel LeBlanc*, Pro Se, East Hardwick, Defendant-Appellee.

¶ 1. **Dooley, J.** Mother appeals from the trial court's final divorce order. She asserts that the court erred in granting the parties a divorce because the statutory requirements for divorce were not satisfied. She also challenges the court's award of primary legal and physical custody of the parties' five children — including her son, but father's stepchild — to father. Finally, she argues that the court abused its discretion in its award of parent-child contact. We affirm the court's order in all respects with the exception of its decision to award father primary parental rights and responsibilities in his stepchild. On this issue, we reverse and remand.

¶ 2. Mother and father married in 1998, and mother filed for divorce in January 2011. Mother and father are the biological parents of four children, born in January 2005, April 2006, February 2008, and January 2010, respectively. Another child, born in May 2002, is mother's child and father's stepchild. Following a multi-day trial, the court granted the parties a divorce; awarded father primary legal and physical rights and responsibilities with the exception that mother have primary authority as to medical decisions; and set forth a visitation schedule.

¶ 3. The court made oral findings and also issued a written order, which was prepared by mother's attorney.[1] Its findings

---

[1] Some of the issues on appeal were created or aggravated by the drafting of the final order by the lawyer for the party who did not prevail and the failure of the

include the following. The parties did not have a smooth marriage. Throughout the marriage, father was generally passive and docile, but he would occasionally become angry. Mother was more hot-tempered than father, and at times she became very volatile.

¶ 4. Mother became pregnant while married to, but separated from, father. Father was present at his stepson's birth, and mother and father resumed living together when the stepson was one year old. The child, for all intents and purposes, has been parented only by mother and father.

¶ 5. Mother was the primary caregiver for all of the children until shortly after her youngest child's birth in January 2010. Mother developed post-partum depression and became less functional. She had a significant psychological breakdown in April 2010 and was hospitalized for three weeks. She later suffered an overdose and returned to the hospital in late May for several weeks. She returned to the hospital for several weeks again in July 2010. She tried to commit suicide while in the hospital, which resulted in a longer stay.

¶ 6. Mother entered a six-week outpatient program at Fletcher Allen in August 2010 where she made significant progress. When mother was released from the hospital, she was unable to return home. She was suffering from depression with psychotic features and could not care for the children. Mother began living in North Troy with a man she met at the Fletcher Allen program. The court found the nature of mother's relationship with the man unclear.

¶ 7. In November 2011, mother stayed at a crisis bed for three to four weeks. She is considered disabled due to her depression for purposes of receiving Social Security benefits. Mother continues to take medication for her depression and sees a counselor weekly.

¶ 8. Due to mother's illness, father became the children's primary caregiver. Father was also trying to earn a living during this time. Father was living in East Hardwick in a house rented to him by his aunt. Father and the family had lived there for seven years. The court regarded father's living situation as relatively stable. While there was a discussion about the house possibly being sold, the court noted that it had been on the

trial court to edit the draft to fully reflect its findings and conclusions. We cannot recommend this practice.

market for seven years, and it found father's living situation unlikely to change.

¶ 9. Father was not as natural a parent as mother, but the evidence indicated that he was learning. Although the children and the house were not always clean, no harm resulted. The children were all together in a stable environment. Father had family support that was both convenient and functional. Father's mother helped with the children, and the children were close to her.

¶ 10. Father was a longtime marijuana smoker who had four convictions for marijuana offenses. Father testified that he did not keep marijuana in the house and did not smoke in front of the children. Mother stated that the children were familiar with marijuana paraphernalia, and knew that father smoked a pipe. The court was unable to determine if father smoked in front of the children; there was no finding on that issue. It noted, however, that father's convictions spoke for themselves, and observed that father might have an incipient substance abuse problem.

¶ 11. While living in North Troy in early 2011, mother removed her eldest child from school and brought him to North Troy where she was homeschooling him. This did not work out well. The child missed his siblings, became restive, and ultimately returned to father's home. Both parents saw the need for the child to return to father's home. Although mother was the child's sole custodian pursuant to a parentage order, she realized that it was in his best interests to be with his siblings.

¶ 12. Also in early 2011, mother stopped living with the man in North Troy and had no place to go. She proposed moving back into father's home and did so by agreement. Mother was increasingly capable of caring for the children and frequently became their daytime caretaker. There was some debate, however, given mother's illness, as to how much responsibility she should have. A doctor had opined that mother should not be left alone with the children. Father needed help, however, and found it useful to have mother living in the home. Despite progress, mother continued to suffer some ongoing depression, and father still saw in her some degree of instability. Mother told father that she had multiple personalities. She often slept late and frequently needed to be alone. Mother was seeing a counselor weekly and was still taking certain medicine, including an antipsychotic drug called Seroquel. The court expressed concern that mother might have undiagnosed mental illnesses beyond depression.

¶ 13. Mother initiated divorce proceedings while the parties were still living together. The main issues in the divorce involved parental rights and responsibilities for all the children, including the child for whom father is the stepfather. The court found that, while the parties were living together in April 2012, father pushed mother and also struck the wall next to her, which scared her. This conduct was the subject of a relief-from-abuse order. The court noted that by the time of the court's divorce order, mother was no longer living with father. She was living in temporary housing in St. Johnsbury. The court viewed the incident of violence cited above as a boiling over of emotions due to living together in a confined space rather than reflective of any pattern of behavior. Now that the parties were separated and did not plan on living together, the court found no likelihood of further abuse.

¶ 14. Based on the findings above and others, the court evaluated the situation of each party under the statutory best-interest factors. See 15 V.S.A. § 665(b)(1)-(9). The court found both parents equally able to provide the children with love and affection, and to meet their material needs. The court found mother better able to meet the children's developmental needs. The court concluded that father's housing situation was more stable than mother's, which it found significant. The children were well-adjusted to father's home. They had extended family nearby, who they were close to and who they saw regularly. Mother did not have stable housing, and were she awarded custody, the children might have to change schools frequently.

¶ 15. Finally, the court found that the children had good relationships with both parents, but that father had supplanted mother's role as the children's primary caregiver. Although mother had made inroads and become a "regular" caregiver, she had not displaced father. The court concluded that both parents had equal ability to foster a positive relationship and frequent and continuing contact with the other parent.

¶ 16. The court found this to be a close case, and ultimately concluded that father should have primary legal and physical rights in the children, with mother having the right to manage the children's medical care. The court found that father had acted as his stepson's parent and concluded, without elaboration, that the factors necessary to support an award of custody to father were

present.[2] The court awarded mother parent-child contact each week from Monday at 9 a.m. until Wednesday at 5 p.m. The court reiterated that father provided the children more stability, and reasoned that the visitation schedule gave father a break and gave the children plenty of time with mother. The court found that mother was not completely well yet, noting that she had needed respite care in November 2011, but it found that she was close. The court explained that its schedule gave mother the respite time she needed. Finally, the court granted the parties a divorce on the grounds that the parties had lived separate and apart for six consecutive months, and that the resumption of marital relations was not reasonably probable. See 15 V.S.A. § 551(7).

¶ 17. Mother moved for reconsideration, challenging the court's custody award and its visitation schedule. With respect to father's stepchild, the motion asserted that "[t]o merely state the requirements of *Paquette* are met . . . does not sustain an award of custody to father." The court denied mother's motion without explanation. This appeal followed.

¶ 18. We start with mother's challenge to the grounds for the divorce. She asserts that the evidence did not establish grounds for divorce as a matter of law because the statutory requirement of six months of separation was not proved. See 15 V.S.A. § 551(7) (divorce may be decreed where married person has lived apart from his or her spouse for six consecutive months and court finds that resumption of marital relations not reasonably probable). Mother points to her testimony that she was still living with father as of the first day of trial in April 2012, and that she and father had engaged in "a sexual relation." Acknowledging that she did not raise this issue below, mother contends that the court committed plain error.

¶ 19. ▮▮▮ There is no plain error here. We recognize plain error in civil cases "only in limited circumstances, i.e., when an appellant raises a claim of deprivation of fundamental rights, or when a liberty interest is at stake in a quasi-criminal or hybrid civil-criminal probation hearing." *Hanson-Metayer v. Hanson-Metayer*, 2013 VT 29, ¶ 40, 193 Vt. 490, 70 A.3d 1036 (quotation

___

[2] In the oral decision, the court stated: "Dad . . . has been [his stepson]'s parent. And the court finds that the factors that allow the court to do this are present as per the *Paquette* decision." See *Paquette v. Paquette*, 146 Vt. 83, 92, 499 A.2d 23, 30 (1985).

omitted). Neither circumstance is present here. We note, moreover, that it was mother who sought a divorce, and mother who alleged in her complaint that the parties had lived separate and apart since May 2010, an allegation that was not disputed. Both mother and her attorney made clear at trial that mother wanted to be divorced from father. In fact, mother's attorney stated to the court, in response to the court's inquiry, that evidence had been presented as to necessary statutory requirements for divorce, including the parties living separate and apart. See *Sprague v. Nally*, 2005 VT 85, ¶ 3, 178 Vt. 222, 882 A.2d 1164 (party may not predicate error on action that party has induced). There was also evidence that mother spent weekends with the man she lived with in North Troy while residing in the marital home and that the two had plans to live together on a more permanent basis. As we have recognized, "a couple may live separate and apart even under the same roof." *Scott v. Scott*, 155 Vt. 465, 468, 586 A.2d 1140, 1142 (1990) (quotation omitted). The court did not commit plain error in granting mother's request for a divorce.

¶ 20. We next consider mother's argument that the court erred in awarding legal and physical rights and responsibilities (except for medical care) to father with respect to his biological children. Mother contends that the court's findings reflect a scattered view of the evidence and do not support the court's conclusion. In support of this point, she notes that the court repeatedly recognized that the parties were equal as to the statutory best-interest factors, or that she had better ability than father in some areas. Also, she asserts that the court assumed, without sufficient evidence, that father would continue to have family support to help him care for the children.

¶ 21. ■ The family court has broad discretion in determining what allocation of parental rights and responsibilities is in a child's best interests. See *Myott v. Myott*, 149 Vt. 573, 578, 547 A.2d 1336, 1339 (1988). We view the evidence "in the light most favorable to the prevailing party below, disregarding the effect of any modifying evidence, and we will not set aside the findings unless they are clearly erroneous." *Stickney v. Stickney*, 170 Vt. 547, 548, 742 A.2d 1228, 1230 (1999) (mem.). The court's conclusions will stand where supported by the findings. *Hanson-Metayer*, 2013 VT 29, ¶ 12.

¶ 22. ■ While the court's oral findings are somewhat scattered, those findings, as well as the findings set forth in the written

order, support the court's decision. This is not a case, as mother suggests, where it is impossible to determine "what was decided, and why" on this point. *Id.* ¶ 44 (citation omitted). The court recognized that this was a close case, but it ultimately decided that father could offer the children more stability than mother. As it explained, the family had lived in the East Hardwick home for seven years, and father had extended family nearby who offered love and assistance. Mother did not have extended family in the area. Mother had been living in many different places and had not, at the time of the hearing, finally determined where her next residence would be. The court found it concerning that it could not predict where mother would be in six months, ten months, or two years. The court's findings in this regard are amply supported by the evidence. Certainly, it is reasonable to conclude that father would continue to be close to his family and that they would offer support. It was reasonable to conclude that father's housing situation would remain stable.

¶ 23. ■ Mother's assertion that the court should have engaged in a more "meaningful balancing" of the statutory best-interest factors is simply a challenge to the court's assessment of the weight of the evidence and the exercise of its discretion, matters exclusively reserved for the trial court. *Chase v. Bowen*, 2008 VT 12, ¶¶ 15, 36, 183 Vt. 187, 945 A.2d 901. While mother disagrees with the result reached by the court, she fails to show any abuse of discretion. Where, as here, the "court's award of custody reflects its reasoned judgment in light of the record evidence, its decision may not be disturbed." *Kasper v. Kasper*, 2007 VT 2, ¶ 5, 181 Vt. 562, 917 A.2d 463 (mem.).

¶ 24. Mother also challenges the court's visitation award with respect to these children. Mother asserts that the court made inadequate findings to support its decision, and that the findings, and the evidence, do not support the court's conclusions. According-ing to mother, the court recognized that she was more involved with the children than father, and thus, it had to grant her more visitation time than it did. She cites trial testimony to support her assertion that she is more involved with the children, and com-plains that the court "irrationally brush[ed] such issues aside" in favor of father's more stable living situation and the assistance he received from his extended family. Mother maintains that it is contrary to legislative policy to order "such a meager amount of

visitation" where the court has found both parents equal in their parenting abilities.

¶ 25. ▮▮ ▮ We find no error. The court has discretion in setting a visitation schedule, and its decision will not be reversed unless that discretion "was exercised upon unfounded considerations or to an extent clearly unreasonable upon the facts presented." *Cleverly v. Cleverly*, 151 Vt. 351, 355-56, 561 A.2d 99, 102 (1989) (quotation omitted). The court explained the basis for its decision here. It sought to impose a schedule that relieved father from providing childcare, and also allowed mother appropriate time with the children as well as adequate time to continue to recover from her depression. To this end, it provided mother with visitation three days each week. The court indicated that the parties could file a motion to alter and amend if they could agree on a schedule that would better suit them, but this did not happen. We also note that the visitation schedule was based, in part, on the court's assessment of the state of mother's mental health. If circumstances change with respect to her mental health, mother is free to file a motion to amend on her own.

¶ 26. ▮▮ While mother would like more time with the children, she has not demonstrated that the court's decision is unreasonable. What she characterizes as the "brushing aside" of certain evidence is more accurately seen as the trial court weighing the evidence and exercising its discretion in deciding what pattern of visitation was in the children's best interests. As previously discussed, it is for the trial court to weigh the evidence, and we defer to its judgment on appeal. See *Hanson-Metayer*, 2013 VT 29, ¶ 12. We reject mother's assertion that the visitation schedule violates the Legislature's directive that children should "have the opportunity for maximum continuing physical and emotional contact with both parents." 15 V.S.A. § 650. While mother may not have as much time with the children as father does, she has been granted ample contact, consistent with what the court found appropriate under all of the circumstances. The schedule here does not contravene the statute.

¶ 27. ▮▮ Finally, mother argues that the court failed to make sufficient findings to support its decision awarding father primary legal and physical rights and responsibilities in his stepson. While we apply a highly deferential standard of review to the court's decision, *Hanson-Metayer*, 2013 VT 29, ¶ 12, the court made no

findings in support of its conclusion on this point and did not explain how the circumstances necessary to support such an award were present. See *id.* (explaining that trial court's findings will stand on review if supported by evidence; conclusions will stand if supported by findings).

¶ 28. We held in *Paquette* that:

if a stepparent stands in loco parentis to a child of the marital household, custody of that child may be awarded to the stepparent if it is shown by clear and convincing evidence that the natural parent is unfit or that extraordinary circumstances exist to warrant such a custodial order, and that it is in the best interests of the child for custody to be awarded to the stepparent.

146 Vt. at 92, 499 A.2d at 29. We explained that it would not serve a child's best interests, for example, "to be placed with a parent who is unfit because of severe mental illness, incapacitating physical disability, or persistent neglect, abuse, or abandonment of the child." *Id.* at 91, 499 A.2d at 29. We cited *Bennett v. Jeffreys*, 356 N.E.2d 277 (N.Y. 1976), as a case illustrating "extraordinary circumstances." In that case, an eight-year old child had been separated from her mother for most of her life, the mother was unmarried and did not have an established household, and the child was strongly attached to her custodian. We also cited *In re Allen*, 626 P.2d 16 (Wash. Ct. App. 1981), where a court concluded that the growth and development of a deaf child would be detrimentally affected by placement with his father where the father, who was an otherwise fit parent, did not know sign language. In that case, the court determined that the child's best interests required placement with his stepmother and her children from a prior marriage, all of whom had learned sign language to help educate the deaf child and integrate him into the family.

¶ 29. In the instant case, there is no question that father stood in loco parentis with respect to his stepchild. At the same time, however, father has not claimed that the record supports a finding that mother is unfit to parent this child; indeed, the court's findings and conclusions are inconsistent with such a claim. Thus, the only ground on which parental rights and responsibilities could be awarded to father is the presence of extraordinary circumstances.

¶ 30. Father sought custody of his stepson and acknowledged the applicability of *Paquette*, but presented no position on how the circumstances required by *Paquette* were present in this case. The trial court explicitly made its findings based on a "more likely than not" standard and not based on the clear and convincing evidence standard required by *Paquette*, 146 Vt. at 92, 499 A.2d at 30. Thus, we are left with no asserted position on how the requirements of *Paquette* are met, no specification by the trial court of the basis on which it found that the requirements of *Paquette* are met, and no findings under the clear and convincing evidence standard as required by *Paquette*.

¶ 31. ■ ■ We have consistently stated that we will not uphold a custody decision where we must speculate on the basis for that decision. See, e.g., *Maurer v. Maurer*, 2005 VT 26, ¶ 16, 178 Vt. 489, 872 A.2d 326 (mem.); *Pigeon v. Pigeon*, 173 Vt. 464, 465-66, 782 A.2d 1236, 1237-38 (2001) (mem.); *Nickerson v. Nickerson*, 158 Vt. 85, 88-89, 605 A.2d 1331, 1333 (1992); *Price v. Price*, 149 Vt. 118, 121, 541 A.2d 79, 81 (1987); *Gustin v. Gustin*, 148 Vt. 563, 565, 536 A.2d 933, 935 (1987). As we held in *Gustin*, where the findings on custody could support an award to either parent, "it is incumbent on the trial court to point out what findings tipped the scale in favor of the award it made. . . . In failing to do so, the trial court leaves this Court to speculate as to the basis for its decision, and this is something we will not do." 148 Vt. at 565, 536 A.2d at 935. The decision here leaves us in the exact situation we found unacceptable in *Gustin* and later cases. We cannot uphold the trial court's decision with respect to father's stepson.

¶ 32. The dissent, also without specifying the grounds for a finding of exceptional circumstances, argues that we should affirm "[b]ecause the oral findings . . . are extensive." *Post*, ¶ 43. To support this argument, the dissent cherry-picks the facts and relies only on those negative to mother. In fact, the trial court found this to be a close case, with two of the statutory best-interest factors favoring each parent and the rest neutral. The dissent relies heavily on mother's mental health issues, but the court found that "mother has generally succeeded in her recovery" and while mother was not completely healthy, "it's close." The doctor's letter on which the dissent relies, *post*, ¶ 42, was solicited by mother because she feared at the time that father was leaving

the children alone with her too often and too early in her recovery process. Mother was regularly taking care of the children.

¶ 33. The dissent also relies on an incident where mother took her eldest child to live with her and homeschooled him, but returned him to father's home because he missed the other children. This occurred when there was no formal visitation schedule so the child was totally separated from the other children. In our view, mother's recognition that the child needed interaction with the rest of the children shows she properly placed his needs above her interests. In any final divorce order, irrespective of whether mother or father is awarded primary physical rights and responsibilities, the visitation order can ensure all the children are together as appropriate.

¶ 34. The evidence suggests reasons why father's stepson might be treated separately from the other children.[3] He is three years older than his nearest sibling and is attending a different school than his siblings.[4]

¶ 35. The dissent has also relied on cases that require the least additional justification for an award of custody to a person who is not a biological or legal parent.[5] We emphasize our view that based on the trial court's existing findings of fact, this case appears unlike those cases from other jurisdictions cited in *Paquette*. A good example is *Allen*, 626 P.2d 16, as explained in *In re B.M.H.*, 315 P.3d 470 (Wash. 2013), both cases cited in the dissent. *Allen* has a lengthy discussion of what circumstances could meet the exceptional circumstances test: "where circumstances are such that the child's growth and development would be detrimentally affected by placement with an otherwise fit parent, parental rights may be outweighed." 626 P.2d at 22. The

---

[3] We are referring to the evidence because, pursuant to our mandate, the trial court can make additional findings to support its decision. There was extensive evidence, particularly from the testimony of mother and of the eldest child's biological father, that bears on father's relationship with his stepson.

[4] Father's stepson has been attending a Christian school, and the other school-age children have been attending a public school. Mother particularly has wanted him to attend a religious school.

[5] The most extreme example is *Stanley D. v. Deborah D.*, 467 A.2d 249 (N.H. 1983), in which the New Hampshire Supreme Court held that the trial court could award custody of a stepchild without "requiring proof of the natural parent's unfitness or other extraordinary circumstances." *Id.* at 251; see *post*, ¶ 45. The holding in *Stanley D.* is directly contrary to *Paquette*, and, for that reason, its factual analysis is not relevant here.

court explained: "There must be a showing of actual detriment to the child, something greater than the comparative and balancing analyses of the 'best interests of the child' test." *Id.* at 23.

¶ 36. The *Allen* court cited two circumstances that together met the exceptional circumstances test — "[the father's] inadequacy in sign language and lack of opportunities for interaction and communication would set back [the child's] intellectual development" and the child had "become integrated into the family unit" that also consisted of the stepmother's three children, who had been adopted by the father, so the custody award kept the unit intact. *Id.* at 22-23. In *B.M.H.*, the Washington Supreme Court stressed that the first consideration was necessary to show exceptional circumstances and an actual detriment to the development of the child. 315 P.3d at 476.

¶ 37. The foregoing discussion is not intended to debate with the dissent whether mother should be awarded custody of her eldest child, but to stress that the trial court's findings and conclusions do not explain the basis for its decision, as our precedents require, and do not meet the requirements of *Paquette*, even if we ignore the requirement of a heightened standard of proof. Put in the wording of *Allen*, the findings may support that awarding father custody of his stepson is in the child's best interests but not that an award of custody to mother would detrimentally affect the child's growth and development, especially in combination with a parent-child contact provision. We must reverse and remand the court's decision regarding father's stepson to enable the trial court to make additional findings, if necessary, and explain its reasoning, or to make a different custody award.

¶ 38. The dissent recognizes that even if it overcomes the trial court's failure to identify and explain its rationale regarding father's stepson, its view still cannot prevail under *Paquette* because the trial judge used a preponderance-of-the-evidence standard of proof in reaching its decision and *Paquette* requires that the decision be based on a clear-and-convincing evidence standard of proof. To avoid this hurdle, the dissent argues that we should overrule *Paquette* on this point. *Post*, ¶ 41.

¶ 39. The first time that the overruling of *Paquette* has ever been advanced in this case is in the dissent. It was not argued below, never considered by the trial judge — who purported to comply with *Paquette* — and it was not raised by either party on appeal. This is a particularly inappropriate case to ignore pres-

ervation requirements because each party has struggled to obtain affordable legal representation and, as a result, has been self-represented for part of these proceedings. If we are going to overrule a clear precedent to decide this case, the litigants should have notice to address the question and we should have the benefit of briefing by counsel. See *DeSantis v. Pegues*, 2011 VT 114, ¶ 31 n.3, 190 Vt. 457, 35 A.3d 152 (declining to consider dissent's position to overrule the clear-and-convincing evidence standard in *Mullin v. Phelps*, 162 Vt. 250, 647 A.2d 714 (1994), because the position was raised for the first time by the dissent and had not been raised by appellant either in the trial court or this Court).

*The decision to order a divorce is affirmed. The decision with respect to parental rights and responsibilities and visitation is affirmed, except that the court's custody and visitation award concerning father's stepson is reversed and remanded for additional proceedings consistent with this opinion.*

¶ 40. **Reiber, C.J.,** dissenting. The majority's opinion is a remand for reconsideration in name only, in that it sends a strong message to the trial court that the *Paquette* standard has not been met in this case as a matter of law. Because the majority upholds the placement of the younger siblings with stepfather,[6] the effect of the decision is to separate the life-long siblings and place the oldest child with a parent who has serious unresolved mental health issues — even though the trial court determined that he should remain with stepfather and his siblings. I believe that the trial court's findings are sufficient to support its custody decision concerning the oldest child under the test set forth in *Paquette v. Paquette*, 146 Vt. 83, 499 A.2d 23 (1985). And I am particularly concerned about this Court's de facto transfer of the oldest child from stepfather to an unstable mother, against the judgment of the factfinder, with no consideration of how the transfer will impact both him and his siblings. See *In re Shields*, 136 P.3d 117, 129 (Wash. 2006) (Bridge, J., concurring) (stating that child's right to stable family life "should include indepen-

---

[6] We refer to father as "stepfather" because that is his legal relationship to the oldest child, and this dissent concerns the trial court's ruling regarding that relationship. See 15A V.S.A. § 1-101(22) (defining stepparent as "person who is the spouse or surviving spouse of a parent of a child but who is not a parent of the child").

dently valued protections of a *child's* relationship with siblings . . . with whom the child has formed a critical bond"). I would affirm the trial court's decision as within its broad discretion. Accordingly, I respectfully dissent.

¶ 41. Moreover, for the reasons explained below, I would overrule *Paquette* to the extent that it requires clear-and-convincing evidence of parental unfitness or extraordinary circumstances before a stepparent can be granted parental rights and responsibilities. A preponderance-of-the-evidence standard is more consistent with the polestar of custody proceedings — the welfare of the children. Indeed, applying the more rigorous clear-and-convincing standard elevates the interests of parents over the safety and welfare of the children involved, which the Legislature has designated as the guiding principle in custody matters.

¶ 42. Among the trial court's oral findings were the following[7]: (1) the son has had no contact with his biological father and had been parented only by mother and stepfather in the family home along with his younger siblings, the four biological children of stepfather and mother; (2) the son and siblings currently reside in a home rented by stepfather from his aunt where the family has

---

[7] I realize that the trial court made other findings that *may* be construed as inconsistent with its *Paquette* decision, but I cite only the above findings because they are the ones that support its discretionary decision. Trial court findings must be construed as consistent if it is reasonably possible to do so, and "this Court must construe those findings so as to support the judgment." *Rogers v. W.T. Grant Co.*, 132 Vt. 485, 489, 321 A.2d 54, 58 (1974); see also *Colby's Ex'r v. Poor*, 115 Vt. 147, 153, 55 A.2d 605, 608-09 (1947) (stating that trial court's "findings are to be construed as consistent whenever . . . reasonably possible to do so" and further must "be construed to support the judgment"). I believe that the trial court's findings *can* be construed as consistent, and that we are bound to construe them favorably to the trial court's judgment.

The majority states that the trial court made its findings by a preponderance of the evidence, but refers only to the trial court's general statement informing the pro se parties that it is required to make findings only by a preponderance of the evidence. The court made no pronouncement as to what standard it was applying here with respect to its *Paquette* decision, and my interest in modifying the standard in *Paquette* has nothing to do with the notion that the trial court applied a preponderance-of-the-evidence standard in this case. Indeed, in this case, each of the findings cited above supporting the trial court's *Paquette* decision was entirely undisputed by the parties. For this reason, we should not disturb the trial court's decision. See *Moran v. Byrne*, 149 Vt. 353, 355, 543 A.2d 262, 263 (1988) ("As the findings of the trial court are supported by the evidence, and as we must construe the findings to support the conclusion, we find no basis on which to disturb the decision below.").

been living for seven years and where stepfather's family provides support and nurturing of the children; (3) mother was hospitalized in 2010 after suffering a nervous breakdown and attempted suicide while in the hospital; (4) in early 2011, she abruptly removed the son from the family home and brought him to live with her, but it did not work out well because he missed his siblings and mother herself concluded that the best thing for her son was to be with his family in the family home; (5) in 2011 a doctor recommended not leaving the children alone with mother, who may have some undiagnosed mental health issues beyond depression with psychotic features; (6) she spent several weeks living at a crisis center in November 2011, just a few months before the divorce hearing took place, and the trial court concluded at the time of the final divorce hearing that her housing situation was in flux; and (7) although she appeared to be getting better, she continued to show signs of instability.

¶ 43. After making these findings, examining the statutory best-interests factors, and awarding stepfather primary[8] parental rights and responsibilities over the parties' other children, the trial court concluded that the *Paquette* test had been satisfied with respect to the son. The court did not state whether it was basing its decision on mother's unfitness or extraordinary circumstances, but either way, the court's determination rests on the findings noted above, which support the court's determination that the *Paquette* test has been satisfied in this case. See *In re April C.*, 760 N.E.2d 85, 95 (Ill. App. Ct. 2001) (stating that because consequences of termination proceeding and removal-of-guardian proceeding differ, "the meaning of the term 'unfit' as it relates to each proceeding is different as well"); *In re Mittenthal*, 235 N.Y.S.2d 729, 739 (Fam. Ct. 1962) (stating that "concept of unfitness and neglect must be viewed with more flexibility when custody is involved, as distinguished from permanent termination of parental rights either immediate or inevitable"). Because the oral findings that support the trial court's *Paquette* decision are extensive, I would not remand the matter for the trial court to designate which aspect of the *Paquette* test it relied upon. The court's findings are sufficient to support its decision, and any

---

[8] The trial court stated that it was awarding stepfather sole physical and legal parental rights and responsibilities, but in fact the court awarded mother legal responsibility on all medical matters and also awarded her significant parent-child contact.

remand of the matter for further consideration will only prolong this litigation. The son was fourteen years old at the time of the final hearing — he needs a prompt resolution of his best interests.

¶ 44. To the extent that the trial court's ruling regarding the son is based on extraordinary circumstances, I disagree with the majority's suggestion that the present case is not comparable to the two cases cited in *Paquette*. One of those cases described the extraordinary circumstances requirement as "a middle ground" that demands "more than the 'best interests of the child' involved, but less than a showing of [parental] unfitness." *In re Marriage of Allen*, 626 P.2d 16, 23 (Wash. Ct. App. 1981). Each case addressing whether extraordinary circumstances exist will involve unique facts that must be considered on a case-by-case basis. See *In re B.M.H.*, 315 P.3d 470, 476 (Wash. 2013) (stating that whether placement with parent would result in actual detriment to child's growth and development is highly fact-specific inquiry that must be determined on case-by-case basis). Courts weighing the circumstances of each case to determine whether extraordinary circumstances exist ultimately must be guided by the paramount concern in custody cases — the welfare of the child. *Brown v. Burch*, 519 S.E.2d 403, 412 (Va. Ct. App. 1999) ("Although each dispute concerning custody and visitation presents unique circumstances[,] . . . the trial court's judgment in every case is guided by a single, unvarying standard that the welfare of the child is the primary, paramount, and controlling consideration of the court.").

¶ 45. In custody proceedings, the trial court, not this Court, is in the best position to assess the credibility of the witnesses, weigh the evidence, and determine whether circumstances justify not adhering to the presumption that the children's best interests align with those of the parent rather than the stepparent. See *Hanson-Metayer v. Hanson-Metayer*, 2013 VT 29, ¶ 12, 193 Vt. 490, 70 A.3d 1036 ("When considering the trial court's analysis and decision in awarding parental rights and responsibilities, this Court applies a highly deferential standard of review."); *Chickanosky v. Chickanosky*, 2011 VT 110, ¶ 14, 190 Vt. 435, 35 A.3d 132 ("In the highly fact-intensive context of a custody determination, we rely on the family court's determinations of fact and evaluations of credibility."). Even if the trial court is called upon to apply the higher evidentiary standard to the facts, our role is to defer to its discretion. We may provide direction consistent with legislative intent, but at the same time must respect the trial court's discre-

tion regarding this most highly sensitive of human concerns — the child's welfare. The trial court's discretion lies in evaluating the circumstances to make what is often a difficult determination as to safety and best interests of the children. See *McDermott v. Dougherty*, 869 A.2d 751, 809 (Md. 2005) (citing factors for determining extraordinary circumstances to award custody to nonparent); *Brown*, 519 S.E.2d at 411 (same); cf. *Stanley D. v. Deborah D.*, 467 A.2d 249, 251 (N.H. 1983) (affirming trial court order granting stepfather physical custody and joint legal custody with natural mother where parties were married when child was one year old, stepfather was only father child had ever known, strong psychological bond existed between child and stepfather, and child had strong sibling bond with parties' other child).

¶ 46. Even if I were to accept the majority's conclusion that in this case the *Paquette* test was not satisfied by clear-and-convincing evidence, I would affirm on a preponderance-of-the-evidence standard. The higher clear-and-convincing standard of proof is not constitutionally compelled and, as exemplified by the majority's decision here, shifts the focus away from the paramount concern — the welfare of the children. We recently declined to judicially adopt an equitable de facto parent doctrine that would apply to third parties with no legally defined relationship to the child, but distinguished *Paquette*. See *Moreau v. Sylvester*, 2014 VT 31, ¶ 1, 196 Vt. 183, 95 A.3d 416. In *Paquette*, we construed the then-existing statutory law to allow "courts to award custody to [still-married] stepparents standing in loco parentis" to children of the marriage in extraordinary circumstances and cases of parental unfitness. *Id.* ¶ 10; cf. *In re Nelson*, 825 A.2d 501, 504 (N.H. 2003) (declining to grant custodial rights to unrelated third person over express objection of natural parent, but making exception for stepparents, "who under certain circumstances have been recognized as having the right to seek custody if it is in the best interests of the child").

¶ 47. Within the context of the legal relationship established by married stepparents and parents, we recognized in *Paquette* the primacy of the best interests of children in custody matters. 146 Vt. at 90, 499 A.2d at 28 ("In Vermont, the legislature has clearly stated that, in considering issues of child custody, the courts are to be guided by the best interests of the child."). We explained that courts have "accorded precedence to the best interests of the

child when those interests conflicted with the rights of a natural parent." *Id.* at 89, 499 A.2d at 28; see *In re Custody of N.M.O.*, 399 N.W.2d 700, 703 (Minn. Ct. App. 1987) ("The principle that the custody of young children is ordinarily best vested in the [parent] . . . is distinctly subordinate to the controlling principle that the overriding consideration in custody proceedings is the child's welfare." (quotation omitted)).

¶ 48. While emphasizing in *Paquette* the primacy of the children's welfare in custody matters, we required stepparents to prove parental unfitness or extraordinary circumstances by clear-and-convincing evidence before being given an opportunity to obtain parental rights and responsibilities. *Paquette* was a split decision in which the dissenters argued that the Legislature had given Vermont courts the authority to make custody orders concerning only natural parents. 146 Vt. at 93, 499 A.2d at 30 (Billings, C.J., dissenting). Our requirement that married stepparents show parental unfitness or extraordinary circumstances by clear-and-convincing evidence to overcome the presumption favoring custody with the "natural" parent appeared to rely upon the then recently decided U.S. Supreme Court decision in *Santosky v. Kramer*, 455 U.S. 745 (1982). See *Paquette*, 146 Vt. at 92, 499 A.2d at 30. The Court in *Santosky* held that "[b]efore a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations [of unfitness] by at least clear and convincing evidence." 455 U.S. at 747-48.

¶ 49. *Santosky*, however, was a termination-of-parental-rights case. It did not involve custody proceedings, but rather concerned a New York statute permitting the state's termination of parental rights based on a showing of the natural parent's unfitness by a preponderance of the evidence. Weighing the due process factors set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), the Court in *Santosky* emphasized the finality of the threatened loss in state-initiated termination proceedings. 455 U.S. at 758-59. The instant case, in contrast, involves a custody dispute in a divorce proceeding in which the focus is on the children's best interests rather than the right of parents to avoid state termination of their parental rights.

¶ 50. To be sure, we held in *Mullin v. Phelps*, 162 Vt. 250, 267, 647 A.2d 714, 724 (1994), "that in divorce or custody proceedings the family court may not terminate child-parent contact of either

parent absent clear and convincing evidence that the best interests of the child require such action." But, notably, we did not disturb the trial court's finding in that case — by a preponderance of the evidence — that father had sexually abused the parties' children. *Id.* Rather, based on our conclusion that the trial court's custody order effectively terminated father's parental rights and responsibilities permanently, *id.* at 263, 647 A.2d at 721, we reversed the court's order, holding "that due process required the court [on remand] either to find the existence of sexual abuse by clear and convincing evidence or to permit, at minimum, continued contact between the father and the boys consistent with their safety," *id.* at 267, 647 A.2d at 724.

¶ 51. In the present case, in contrast, the superior court awarded mother significant parent-child contact, in addition to legal responsibility for the children's medical needs. This is not a case in which the court completely and irrevocably terminated a natural parent's parental rights. Accordingly, I see no constitutionally compelled basis for imposing a clear and convincing standard that elevates the natural parents' rights above the safety and welfare of children. See *Tailor v. Becker*, 708 A.2d 626, 628-29 (Del. 1998) (rejecting constitutional challenge to statute permitting custody to be given to custodial stepparent over noncustodial parent after custodial natural parent's death, based on conclusion that statute did not irrevocably terminate natural parent's rights but rather permitted parent-child contact and requests for modification of custody order); cf. *Stanley D.*, 467 A.2d at 251 (stating that order awarding joint custody to stepparent and natural parent was not equivalent to termination of parental rights and therefore did not require proof of extraordinary circumstances or natural parent's unfitness).[9]

---

[9] I do not advocate lowering the standard of proof in *Paquette* because the higher standard is not constitutionally compelled, as the majority posits. Rather, I believe doing so would be more consistent with the legislative policy of placing the emphasis in custody matters on the welfare of the children instead of their parents. Because the standard is not constitutionally compelled and was judicially implemented, we can and should change it. *Paquette* was a 3-2 decision decided thirty years ago when courts were only beginning to recognize the significance of legal nonparents, such as stepparents, in children's lives. As for the majority's preservation concern, this Court can and does act sua sponte when vital interests are at stake. Indeed, we did so in *Mullin v. Phelps* itself. See 162 Vt. at 263 n.2, 647 A.2d at 722 n.2.

¶ 52. Nor does the U.S. Supreme Court's decision in *Troxel v. Granville*, 530 U.S. 57 (2000), pose a constitutional impediment to requiring stepparents to prove extraordinary circumstances or the natural parent's unfitness by only a preponderance of the evidence. In *Troxel*, the Supreme Court affirmed a state court decision striking down a "breathtakingly broad" state statute that allowed courts to grant visitation to any person at any time based solely on a best-interest analysis. *Id.* at 67, 69-70. Here, in contrast, we are dealing with a narrow class of third persons — stepparents — and we are not eliminating the threshold requirement that they show extraordinary circumstances or parental unfitness before being able to obtain parental rights and responsibilities. See, e.g., *Gray v. Chambers*, 614 N.Y.S.2d 591, 592 (App. Div. 1994) (noting stepparents' threshold burden of showing extraordinary circumstances or natural parent's unfitness, but not indicating clear and convincing burden of proof); *B.M.H.*, 315 P.3d at 475 (same).

¶ 53. In sum, I would overrule our holding in *Paquette* to the extent that it requires a married stepparent of a child of the biological parent-spouse to prove unfitness of the parent or extraordinary circumstances by clear and convincing evidence. See also *Bancroft v. Bancroft*, 154 Vt. 442, 447, 578 A.2d 114, 117 (1990) (citing *Paquette* standard); *In re S.B.L.*, 150 Vt. 294, 298-99, 553 A.2d 1078, 1081-82 (1988) (same). The result, with respect to in-loco-parentis stepparents, would be similar to an Oregon statute recognizing "a presumption that the legal parent acts in the best interest of the child," but providing that if there is a child-parent relationship and the presumption "has been rebutted by a preponderance of the evidence," the court is authorized to grant parental rights and responsibilities to the person having the parent-child relationship if doing so is in the best interest of the child. See Or. Rev. Stat. § 109.119(2)(a), (3)(a). In any event, I believe that the trial court did not abuse its broad discretion in concluding that the *Paquette* test was satisfied in this case. Therefore, I respectfully dissent.

¶ 54. I am authorized to state that Justice Crawford joins this dissent.