NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2024 VT 30

No. 23-AP-275

| | |
|---|---|
| Melanie Centeno | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, Family Division |
| | |
| Rodney Centeno | February Term, 2024 |

Thomas Carlson, J.

Jacob Oblak of Henchen & Oblak, LLP, Waterbury, for Plaintiff-Appellee.

Mary G. Kirkpatrick of Kirkpatrick & Goldsborough PLLC, South Burlington, for Defendant-Appellant.

PRESENT:  Reiber, C.J., Eaton, Carroll, Cohen and Waples, JJ.

¶ 1.  **WAPLES, J.**  Father appeals the family division's order awarding sole legal parental rights and responsibilities for the parties' two children to mother.  Father argues that the family division erred in finding that there was evidence of abuse as defined in 15 V.S.A. § 1101 and 33 V.S.A. § 4912.  We agree with father that the finding of abuse was clearly erroneous and therefore strike that finding.  Because the remaining findings were sufficient to support the award of parental rights and responsibilities to mother, we otherwise affirm the order.

¶ 2.  Mother and father each separately filed for divorce in July 2022.  Father's complaint was consolidated into this proceeding.  After a hearing that took place over three days

in November 2022 and April and July 2023, the court issued a final order on parental rights and responsibilities and parent-child contact in which it made the following findings and conclusions.

¶ 3. The parties married in Vermont in 2006. They initially moved to Washington, D.C., then relocated to California in 2008. Son was born in May 2008 and daughter was born in April 2010. During the children's early years, mother was the primary caregiver and made medical, school, and child-care arrangements for them. Father was involved and active in the children's lives. He went to many meetings and appointments and volunteered at the children's schools. Father attended approximately a quarter of the children's medical and dental visits. Recently, both parents have been involved in arranging for and attending medical care including routine care, counseling, orthodonture, and son's endocrinology treatments.

¶ 4. Mother grew up in Chittenden County, where her parents, sisters and extended family continue to live. Father is from California. His siblings and extended family live in the San Francisco Bay area. In 2016, the parties decided to move to Vermont. They found housing and enrolled the children in school in Charlotte. Both parents worked full-time. Father coached Little League and chaperoned after-school ski trips, and mother coordinated gymnastics, summer camps and piano lessons, with father's assistance.

¶ 5. When the coronavirus pandemic began in 2020, father was furloughed from his job as aquatics director at a local fitness center, causing strain on the family finances. Father eventually returned to work but left the position in 2021 because he was dissatisfied with the responsibilities and compensation. He wanted to move back to California, where he felt there would be better job opportunities for himself and mother. In the spring of 2021, as the family's lease on their rental home was expiring, mother agreed to pack up the family and look for work in California, though she did not commit to remaining there. The parties left their belongings in storage in Vermont.

2

¶ 6.     By August 2021, neither party had found work and they were tired of relying on father's family for housing.  Mother returned to Vermont with the children.  Father did not initially agree to this but eventually acquiesced.  He returned to Vermont in the fall and moved into separate housing from mother.  In the spring of 2022, father returned to California.  He did not tell mother at the time that he intended to move there permanently.

¶ 7.     In June 2022, mother's lease expired, and she began looking for a house to purchase in Chittenden County.  Father came back to Vermont for son's eighth-grade graduation.  Mother agreed that the children would return to California with father for a visit beginning in mid-June.  Mother planned to go to California later in July and bring the children back to Vermont.  In his communications to mother, father seemed to acknowledge this plan.  Mother purchased return flight tickets for herself and the children and shared the itinerary with father.  Later in June, father told mother that he might stay in California.

¶ 8.     In early July 2022, father called mother after she had a long phone call with son, who was in California with father.  Father was angry that mother had talked to son about staying with the plan to return to Vermont.  Mother explained that she was responding to father's discussions with the children about remaining in California and attending school there.  Son was in the room with father during this conversation.  Mother ended the call after father declared that son was old enough to make his own decision.

¶ 9.     When mother arrived in California later that month, father informed her that he had decided the children would stay with him and that he and his family would do whatever it took to get sole custody.  He refused to allow the children to return to Vermont with her and threatened to cancel their flights.  Later in the visit, while the family was having breakfast, mother began crying and son tried to comfort her.  Father told the children that mother was having a mental breakdown in response to father's announcement.

¶ 10.    On July 25, mother picked up daughter from father's sister's house and took her to the airport.  She decided to leave son with father to avoid a confrontation, and misled son about where she and daughter were going.  She tried to explain her decision to son over the phone that day.  Son was devastated to be left behind.  When mother informed father that she was leaving with daughter, father called the police to try to prevent them from getting on the flight.  Mother and daughter were allowed to leave.

¶ 11.    Father initially denied that he had planned in advance to keep the children in California.  However, the court found that he stopped depositing his paychecks into the parties' joint account, signed a lease with the entire family listed as occupants in mid-July, enrolled daughter in junior high school, and informed the children when they arrived that they would be going to school in California that fall.  In mid-July, he sent an email to his California relatives informing them of his actions.  He acknowledged in the email that mother planned to return to Vermont with the children and that Vermont was legally their home state.  However, he stated he would not let her leave with them unless she obtained a court order.

¶ 12.    After she returned to Vermont, mother filed for divorce and requested and received an emergency order directing father to bring son back.  Father and son subsequently returned to Vermont.  The parties were eventually able to agree to a temporary parent-child contact schedule giving each parent equal time with the children.

¶ 13.    The court found that mother's relationship with son was damaged by her decision to leave California without him.  In January 2023, they had an argument in which son told mother, "Whatever my dad did to you, you deserved it, and if I did what you did I'd kill myself."  Mother slapped him in the mouth.  She subsequently arranged for therapy sessions involving her and the children, which helped repair the relationship between her and son.  The court found that their relationship seemed "to be returning to its prior warmth and trust."

¶ 14. Since the fall of 2022, mother and father had been able to coparent and communicate relatively well. Mother occasionally expressed suspicions that father was engaging in alienation, but the court did not find that father was in fact attempting to alienate the children from her. The court found that during their marriage, father tended to be controlling and sometimes belittled mother. Given this history and the events of July 2022, the court expressed doubt that father, if granted sole custody, would be able to consistently place the children's best interests ahead of his own and support mother's relationships with them.

¶ 15. The court then assessed the factors set forth in 15 V.S.A. § 665(b). It found that both parents were able and disposed to provide the children with love and guidance and to meet their material and developmental needs. They were generally able to communicate and cooperate with each other to make decisions regarding the children, with the notable exception of the July 2022 incident. The children had lived in Vermont for seven years. They had strong ties to father's family in California but had similar ties to their Vermont family and their friends were in Vermont. The court found that moving to California would be a drastic change and would potentially harm the children's connection with mother. Mother had played a slightly greater role in caregiving for the children over the course of their lives. Finally, the court found:

> Although with a significant measure of caution in using the term, the court finds that in Father's attempted coup a year ago, there is evidence of abuse within the statutory meaning in 15 V.S.A. [§] 1101, and particularly as defined in 33 V.S.A. [§] 4912. The court finds that Father's plan, however well-intentioned, risked and actually caused harm to the psychological growth, development and welfare of the children in this case. It was his plan that then led to Mother's misjudgment which caused its own harm.

The court accordingly awarded mother sole legal and primary physical rights and responsibilities, subject to a parent-child contact schedule that gave father approximately equal time with the children. Father appealed.

5

¶ 16.    Before we address father's arguments, we must first resolve mother's motion to dismiss this appeal for lack of appellate jurisdiction. Mother moved to dismiss the appeal before briefing was due, arguing that the family division's order on parental rights and responsibilities and parent-child contact was not appealable as of right because the court did not resolve all issues in the divorce proceeding in that order. We deferred ruling on the motion and now deny it.

¶ 17.    In general, "[t]o be final and appealable an order must end litigation on the merits or conclusively determine the rights of the parties, leaving nothing for the court to do but execute the judgment." In re Burlington Bagel Bakery, Inc., 150 Vt. 20, 21, 549 A.2d 1044, 1045 (1988) (quotation omitted). Mother is correct that an order awarding parental rights and responsibilities ordinarily does not become final and appealable until the court issues the final divorce decree, thus disposing of all issues in the case. See Morissette v. Morissette, 143 Vt. 52, 58, 463 A.2d 1384, 1387 (1983) (explaining that divorce order finally adjudicating issue that prior order expressly left to be decided was final appealable order because it resolved all remaining issues in case). The family division may issue a partial final judgment on an issue in a divorce proceeding, but "only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." V.R.C.P. 54(b); see also V.R.F.P. 4.0(a)(2)(A) (making Vermont Rules of Civil Procedure applicable to divorce actions). Absent such a determination and direction, the order is not a final judgment. V.R.C.P. 54(b); see Mudgett v. John A. Russell Corp., 133 Vt. 551, 552, 349 A.2d 243, 244 (1975) (dismissing appeal from order that did not make determination or direction required by V.R.C.P. 54(b)).

¶ 18.    Here, the court stated that it was issuing a "final order" on parental rights and responsibilities and parent-child contact only, but the court did not make an express determination that there was no just reason for delay, as required by Vermont Rule of Civil Procedure 54(b). Accordingly, the order was not a final appealable judgment and was appealable only pursuant to Vermont Rule of Appellate Procedure 5. See Mudgett, 133 Vt. at 552, 349 A.2d at 244; cf.

6

Paquette v. Paquette, 146 Vt. 83, 84, 499 A.2d 23, 25 (1985) (holding that stepfather's appeal of family court order denying his request for custody of stepson was properly before court even though divorce had not been finally adjudicated because court entered partial final judgment in accordance with Rule 54(b)).

¶ 19.    However, in December 2023, while this appeal was pending, the family division issued a final decree of divorce resolving all remaining issues below.  Given that there is now a final judgment, the parties have fully briefed the merits of the appeal, and this Court has expended valuable time preparing the case, we suspend the rules and reach the merits of the appeal.  See Huddleston v. Univ. of Vt., 168 Vt. 249, 251, 719 A.2d 415, 417 (1998) (explaining that interlocutory order may be reviewed as final judgment when dismissal would result in another appeal after final judgment, merits of questions are fully briefed, and Court has spent time preparing for case).

¶ 20.    Although we deny the motion to dismiss, we are concerned by an apparent trend in the family division of issuing "final" orders on some, but not all, issues in divorce proceedings, without strictly following the procedure set forth in Rule 54(b).  We understand the motivation to resolve custody disputes quickly so that children and their parents can have permanency.  However, this practice runs the risk of multiple appeals from the same divorce proceeding, as a party may seek to challenge both the custody order and the subsequent final property order.  This Court has a policy of avoiding piecemeal review.  See In re J.G., 160 Vt. 250, 251, 627 A.2d 362, 363 (1993).  The practice also may lead to genuine confusion regarding a party's right to appeal.  See Sirkin v. Zartarian, No. 21-AP-239, 2022 WL 1055144, at *2 (Vt. Apr. 8, 2022) (unpub. mem.) [https://perma.cc/FX74-2L5W] (denying defendant's motion to dismiss appeal from August 2021 order on parental rights and responsibilities, which plaintiff filed in October 2021, as untimely because it was unclear whether August 2021 was intended to be final).  In some cases, it may

7

possibly cause litigants, who are often unrepresented in family proceedings, to lose their appeal rights altogether.

¶ 21. The better practice is for the family division to issue a temporary order on parental rights and responsibilities, which can be incorporated into the final divorce decree when issued. See 15 V.S.A. § 594a (authorizing family division to issue temporary relief in divorce proceeding). If the court finds that partial final judgment is necessary under the circumstances of a particular case, it must strictly adhere to the procedure in Rule 54(b) to ensure that its intent is absolutely clear. In most situations, however, a single, final appealable order in which the court grants the divorce and resolves all issues in the case is preferable.

¶ 22. We now turn to the merits of this appeal. Father challenges the court's finding that he abused the children by trying to move the family to California in July 2022. Father argues that the record and findings do not support a finding of abuse as that term is defined by statute, and that the clearly erroneous finding requires reversal of the parental rights and responsibilities award.

¶ 23. "[W]hen reviewing the factual findings of a trial court we view them in the light most favorable to the prevailing party below, disregarding the effect of any modifying evidence, and we will not set aside the findings unless they are clearly erroneous." Stickney v. Stickney, 170 Vt. 547, 548, 742 A.2d 1228, 1230 (1999) (mem.). A factual finding is clearly erroneous if it is unsupported by any evidence in the record. Alberino v. Balch, 2008 VT 130, ¶ 7, 185 Vt. 589, 969 A.2d 61 (mem.). We review the court's legal conclusions de novo. Stickney, 170 Vt. at 548, 742 A.2d at 1231.

¶ 24. The family division "has broad discretion in determining what allocation of parental rights and responsibilities is in a child's best interests." LeBlanc v. LeBlanc, 2014 VT 65, ¶ 21, 197 Vt. 17, 100 A.3d 345. In fashioning an award of parental rights and responsibilities, the family division must consider all relevant evidence, including the factors set forth in 15 V.S.A. § 665(b). Gilbert v. Gilbert, 163 Vt. 549, 553, 664 A.2d 239, 241 (1995).

8

¶ 25. At issue in this appeal is the ninth factor, which is "evidence of abuse, as defined in section 1101 of this title, and the impact of the abuse on the child and on the relationship between the child and the abusing parent." 15 V.S.A. § 665(b)(9). Section 1101 of Title 15 defines "abuse" to include, among other things, "[a]buse to children as defined in 33 V.S.A. chapter 49, subchapter 2." 15 V.S.A. § 1101(1)(E).[1] Chapter 49, subchapter 2 of Title 33, which contains procedures for reporting child abuse and for placing an individual on the Child Protection Registry, defines an "[a]bused or neglected child" to mean "a child whose physical health, psychological growth and development, or welfare is harmed or is at substantial risk of harm by the acts or omissions of his or her parent or other person responsible for the child's welfare." 33 V.S.A. § 4912(1).[2] "Harm" means "physical injury or emotional maltreatment," failure to provide a child with basic needs, or abandonment. Id. § 4912(6). There is no evidence, nor any allegation, that father caused or attempted to cause physical harm to the children, failed to supply them with adequate food, shelter, clothing, or health care, or abandoned them. Rather, the family division here apparently determined that father's behavior constituted "emotional maltreatment," which is defined as "a pattern of malicious behavior that results in impaired psychological growth and development." Id. § 4912(5).

¶ 26. We construe the above provisions to give effect to the Legislature's intent, as evidenced by the plain meaning of the language used. T.C. v. L.D., 2020 VT 19, ¶ 4, 211 Vt. 582, 229 A.3d 77. "When legislative intent is clear from the statutory language, we accept the plain meaning, our inquiry is at its end, and [we] enforce the statute according to its terms." Id.

---

[1] The statutory definition of abuse also includes causing or attempting to cause physical harm, placing another in fear of serious physical harm, stalking, and sexual assault. Id. § 1101(1)(A)-(D). Father has not been alleged to have engaged in any behavior that would qualify as abuse under these definitions.

[2] The definition of an abused or neglected child also includes "a child who is sexually abused or at substantial risk of sexual abuse by any person and a child who has died as a result of abuse or neglect." 33 V.S.A. § 4912(1). These provisions are not relevant in this case.

¶ 27. The record does not support the family division's finding that father's actions constituted abuse in the form of emotional maltreatment within the meaning of § 4912(5). First, there is very little evidence that father's efforts to relocate to California, as opposed to mother's act of returning to Vermont without son, actually impaired the children's psychological growth and development. Neither party presented any evidence from the children's therapists or other medical professionals. Testimony about the children's emotional state focused almost entirely on son's anger toward mother, which everyone seemed to agree resulted from her decision to leave without him. But even accepting that father's unilateral attempt to move the family to California may have caused some emotional harm to the children, the trial court did not identify a "pattern of malicious behavior" by father toward the children. The only findings about father's behavior that directly involved the children were that the children were present on at least two occasions when parents were arguing about the move, father told the children that they would be staying in California and showed them their new house, and father called the police when mother took daughter to the airport. To the extent that these acts could amount to a pattern, there is no indication that they were "malicious," that is, motivated by a desire to harm the children. See Malicious, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/malicious [https://perma.cc/GFG8-RNUV] (defining malicious as "having or showing a desire to cause harm to someone"). To the contrary, the court acknowledged that father believed moving to California was in the children's best interests, and that his attempt to do so was "well-intentioned." The court also found that father was a loving and engaged parent before and after the July 2022 incident, and that the parties had managed to coparent since that time with relative goodwill toward each other.[3]

---

[3] For this reason, the parental alienation cases cited by mother in support of her argument that father's behavior constituted abuse are inapposite. This case does not involve an extended campaign by one parent to cut off all contact between the children and the other parent.

The record simply does not support the court's determination that there was evidence that father emotionally abused the children in this case.

¶ 28.    Mother argues that § 4912(5) does not require the pattern of malicious behavior to be targeted toward the children, and points to the court's other findings about father's behavior toward her in July 2022 as evidence of abusive conduct. We need not determine whether the statute requires the malicious behavior to be directed at the children because even viewed through this broader scope, the evidence does not support a finding of emotional maltreatment. For one thing, it is unclear whether the children were aware of this other conduct by father, such that it could impact them psychologically. Further, the court did not find that father's behavior was motivated by an impulse to hurt mother. Father's desire to get his own way in relocating to California does not necessarily equate to an affirmative desire to harm mother. We also reject mother's suggestion that it was sufficient for father's behavior to be intentional. The plain meaning of the term "malicious" as used in § 4912(5) requires not just intention but a motivation to harm another. Mother cites no authority to support her alternative interpretation of the term.[4]

¶ 29.    The family division's finding that there was evidence that father engaged in emotional abuse as defined in 15 V.S.A. § 1101 and 33 V.S.A. § 4912 is clearly erroneous and cannot stand. We conclude, however, that the error does not require reversal of the entire order. "Erroneous or unsupported findings do not require reversal . . . unless they are shown to have been prejudicial." Rogers v. Parrish, 2007 VT 35, ¶ 21, 181 Vt. 485, 923 A.2d 607.

---

[4]  We acknowledge that "malice" has different meanings in tort law, but there is no reason to believe that the Legislature intended any of those specific legal meanings, as opposed to the plain-language meaning, in its definition of child abuse. See Crump v. P & C Food Mkts., Inc., 154 Vt. 284, 293, 576 A.2d 441, 447 (1990) (explaining that for purpose of defamation claim, malice can mean "knowledge of the statement's falsity or with reckless disregard of its truth, or conduct manifesting personal ill will, reckless or wanton disregard of plaintiff's rights, or carried out under circumstances evidencing insult or oppression" (quotation and citation omitted)); Chittenden Tr. Co. v. Marshall, 146 Vt. 543, 550, 507 A.2d 965, 970 (1986) ("The malice element of a malicious prosecution claim requires a showing that the baseless suit was instituted from any improper and wrongful motive." (quotation omitted)).

¶ 30.    The abuse finding was not essential to the court's ultimate decision to award custody to mother in this case.  In assessing the § 665(b) factors, the court found that both parents were equally situated in terms of their ability to provide the children with love and guidance and to meet their basic and developmental needs.  However, it found that the children had lived in Vermont for seven years and had important family relationships and friendships in Vermont and that mother had a somewhat greater role in their caregiving—factors favoring mother.  The court also found that father had a tendency to be controlling and belittling toward mother.  Based on this, and the facts of his "attempted coup" in July 2022, the court expressed concern that if father were given the power to make legal decisions for the children, he might have difficulty putting their interests ahead of his own or supporting mother's relationship with them.  In essence, the court found that custody with mother was more likely to achieve the goal of maximizing contact with both parents.  See 15 V.S.A. § 650 (stating legislative intent that in general, "it is in the best interests of [a] minor child to have the opportunity for maximum continuing physical and emotional contact with both parents").  Father does not challenge any of these findings, which are supported by the evidence and in turn amply support the court's ultimate decision to award custody to mother.  See Lyddy v. Lyddy, 173 Vt. 493, 496, 787 A.2d 506, 512 (2001) (mem.) (affirming child-custody award despite erroneous findings because those findings were not controlling with respect to ultimate decision and remaining findings were accurate).  We therefore see no reason to disturb that decision.

The family division's finding that there was evidence of abuse by father is stricken; the order is otherwise affirmed.

FOR THE COURT:

_____
Associate Justice