2015 VT 64

# Ruth H. MacCormack v. Mark S. MacCormack

[123 A.3d 383]

No. 13-390

Present: Reiber, C.J., Dooley, Skoglund and Robinson, JJ., and Durkin, Supr. J., Specially Assigned

Opinion Filed April 17, 2015

*Mary P. Kehoe* of *The Kehoe Law Firm, P.C.*, Burlington, for Plaintiff-Appellee/Cross-Appellant.

*Lauren S. Kolitch*, Waitsfield, for Defendant-Appellant/Cross-Appellee.

¶ 1. **Reiber, C.J.** Father appeals the trial court's award of sole legal and physical parental rights and responsibilities to mother. Father also appeals the trial court's calculation and division of marital assets, challenging the application of a hypothetical real-estate commission in awarding father a portion of the marital home's equity as well as the trial court's division of the parties' retirement assets. Mother cross-appeals the trial court's parent-child contact order on the grounds that the order does not achieve its stated goal and is not in the best interests of the parties' child. We affirm the trial court's order except its application of the hypothetical real-estate commission in a scenario in which no sale is contemplated, which we reverse.

¶ 2. The parties agree that theirs was a short-term marriage. Father and mother met in June 2006, began dating, and married in July 2008. They had a child in December 2009. The marriage suffered a lack of intimacy throughout its duration. After the

parties attempted marriage counseling, mother filed for divorce in June 2011. In October 2011, the trial court issued a temporary order awarding father and mother shared legal parental rights and responsibilities but made no order relative to physical parental rights and responsibilities. The court ordered fifty-fifty parent-child contact. The contested hearing was held over four dates: on August 29 and November 9 in 2012, and January 14 and March 19 in 2013. The trial court issued its factual findings and legal conclusions in July 2013. It granted the divorce on the grounds that the parties had lived separately for more than six months and there was no reasonable probability of resuming the marital relationship.

¶ 3. In reviewing a judgment from the trial court in a divorce proceeding, we look to whether the trial judge has adequately " 'explain[ed] the underlying rationale for its decision, which we will not disturb absent a showing that the court abused its discretion.' " *Billings v. Billings*, 2011 VT 116, ¶ 11, 190 Vt. 487, 35 A.3d 1030 (quoting *Wade v. Wade*, 2005 VT 72, ¶ 13, 178 Vt. 189, 878 A.2d 303). This standard of review applies both to awards of parental rights and responsibilities and to property division. *LeBlanc v. LeBlanc*, 2014 VT 65, ¶ 21, 197 Vt. 17, 100 A.3d 345 ("The family court has broad discretion in determining what allocation of parental rights and responsibilities is in a child's best interests."); *Atwood v. Atwood*, 143 Vt. 298, 300, 465 A.2d 1354, 1355 (1983) (citing 15 V.S.A. § 751) ("Trial courts have wide discretion . . . in formulating awards of property upon divorce.").

## I. Parental Rights and Responsibilities

¶ 4. We turn first to the trial court's determination that mother have sole parental rights and responsibilities regarding the parties' child. "The trial court has broad discretion in a custody matter, and we must affirm unless the discretion is 'erroneously exercised, or was exercised upon unfounded considerations or to an extent clearly unreasonable in light of the evidence.' " *Myott v. Myott*, 149 Vt. 573, 578, 547 A.2d 1336, 1339-40 (1988) (citation omitted); see also *Porcaro v. Drop*, 175 Vt. 13, 15, 816 A.2d 1280, 1283 (2002) ("Given its unique position to assess the credibility of witnesses and weigh the evidence, we will not set aside the family court's findings if supported by the evidence, nor its conclusions if supported by the findings." (quotations and alterations omitted)).

¶ 5. In determining parental rights and responsibilities, "the Court shall be guided by the best interests of the child." 15 V.S.A. § 665(b). In determining the best interests of the child, the trial judge "shall consider at least" the nine factors listed in § 665(b). In reviewing a determination of parental rights and responsibilities, we examine whether " 'the findings as a whole reflect that the trial court has taken the statutory factors into consideration, in so far as they are relevant, in reaching its decision.' " *Harris v. Harris*, 149 Vt. 410, 414, 546 A.2d 208, 212 (1988) (quoting *Rosenfeld v. Rosenfeld*, 249 N.W.2d 168, 171-72 (Minn. 1976)). Although we have not required that the trial court make its findings in a specific form, we have observed "that it would be preferable for the trial court to structure its findings and conclusions to show the findings relevant to each factor together with a conclusion as to each factor." *Id.* The trial court did so in this case.

¶ 6. In its conclusions of law regarding the parties' parental rights and responsibilities, the trial court discussed each factor in turn, restating relevant findings and making conclusions based upon them. The trial court concluded that most of the statutory factors favored neither parent. While acknowledging that the parties disagreed over appropriate medical treatment, the trial court found that both father and mother were able to meet the child's material needs and provide a safe environment for her. See 15 V.S.A. § 665(b)(2). The trial court found that a change in either parent's residence would not be a factor in its decision and concluded that the child's adjustment to her housing, school, and community did not favor one parent or the other. See *id.* § 665(b)(4). With regard to the parties' abilities to foster positive relationships and ongoing contact between the child and one another, the trial court acknowledged the difficulty that mother and father have communicating with each other and concluded that this factor also favored neither parent. See *id.* § 665(b)(5). The trial court concluded that the child's relationships with other people who might significantly affect her, such as her extended family, also favored neither father nor mother. See *id.* § 665(b)(7). The trial court explained why the parties' ability to communicate, cooperate, and make joint decisions was not a relevant factor in its decision, as they could not agree to share custody. See *id.* § 665(b)(8). Likewise, as there was no evidence of abuse, the trial court explained that this was not a relevant factor in determining

who should have sole parental rights and responsibility. See *id.* § 665(b)(9). When considered together, these determinations reflect that the case was a close one.

¶ 7. Ultimately, the trial court's findings regarding the parents' ability and disposition to provide guidance to the child and to meet her developmental needs tipped the balance in favor of a determination that mother should have sole parental rights and responsibilities. See *id.* § 665(b)(1), (3). Prior to meeting mother, father successfully completed a four-year law-office clerkship that qualified him to seek admission to the Vermont bar. He never sat for the Vermont bar exam, however, and so never became qualified to practice law. The trial court found that father allowed mother to mistakenly believe he was a fully-qualified "attorney," and that in the five years that elapsed between their meeting and divorce, father never corrected mother's mistaken impression. The trial court rooted this finding in evidence pertaining to father's lack of candor and the failure to correct mother's impression of his professional status during their marriage. Thus, his actual professional status remained undisclosed until after divorce proceedings began.

¶ 8. In making these findings, the trial court referred to evidence that father misrepresented his professional status to mother. The trial court noted that whether father misrepresented his professional status to mother during the marriage gave rise to "substantial conflicting testimony." Nevertheless, the trial court found that testimony from father's witness offered to rebut mother's lack of knowledge regarding his actual professional status was not credible. We defer to the trial court's credibility assessment that favored mother's version of events. *Hanson-Metayer v. Hanson-Metayer*, 2013 VT 29, ¶ 12, 193 Vt. 490, 70 A.3d 1036; see also *Porcaro*, 175 Vt. at 15, 816 A.2d at 1283 (acknowledging trial court's "unique position to assess the credibility of witnesses"). Mother supported her testimony by offering as an exhibit her and father's wedding announcement, which reads: "[Father] is a tax attorney. He received . . . his law degree from Western New England College, School of Law." Neither statement is true. Father testified that he did not take steps to correct the impression because he is not from the town where the announcement was published and lives far away from it. Absent any credible evidence that mother knew father was not a fully-qualified attorney, it is uncontroverted that father never corrected mother's mistaken impression during their marriage.

¶ 9. Father has challenged the trial court's findings by arguing that he did not misrepresent his professional status to mother because, in his view, while he may not be a fully-qualified "attorney," he may nonetheless still call himself a "lawyer." He maintains that it was appropriate for him to refer to himself as a "lawyer" throughout the marriage and suggests that he did not need to correct the impression he gave mother that he was something other than a fully-accredited attorney.[1] The trial court's determination does not rely upon father's semantic assertions, however, but rather upon its findings regarding the child's best interests — one of which was that he allowed mother to believe things about himself that were not true.

¶ 10. The critical issue is not whether father can accurately call himself an "attorney"; it is whether he deceived mother both with overt misrepresentations and with misrepresentations made by omission. The trial court acknowledged that father believes there is a difference between a "lawyer" and an "attorney" and unilaterally decided not to discuss the difference with mother. According to the trial court, father's decision to allow mother to persist in her mistaken impression went "beyond not wanting to get into the 'nuances' between an attorney and a lawyer." The trial court determined that father "allow[ed] what may have been an initial misunderstanding by the plaintiff to evolve into on-going deception." In the context of their relationship and the personal commitments they made to each other through the bonds of marriage, the trial court essentially found that father lied about his identity. Based on this finding, the trial court concluded that it would be more appropriate for mother to exercise sole parental rights and responsibilities for the parties' child. The finding is "supported by the record evidence" and we see no clear error in it. See *Hoover (Letourneau) v. Hoover*, 171 Vt. 256, 261, 764 A.2d

---

[1] Without acknowledging the merits of father's argument, the trial court stated in dicta that "many individuals attend and graduate from law school who do not become practicing attorneys but are entitled to refer to themselves as lawyers. Nevertheless, one year of law school does not a lawyer make." We note that the Rules of Admission to the Bar of the Vermont Supreme Court do not require applicants to attend an accredited law school; someone who successfully completes a four-year office study would be in the same position as a law-school graduate with regard to eligibility to sit for the Vermont bar exam. See Rules of Admission § 6(g). Our rules require each candidate to successfully pass the bar exam as well as a Character and Fitness Committee review before they may be regarded as a Vermont-licensed attorney. *Id.* §§ 6(a), 11.

1192, 1195 (2000) (reviewing trial court's findings of fact for clear error).

¶ 11. ██ As there is no clear error in the trial court's findings, we turn to whether its conclusions and judgment — that mother should have sole parental rights and responsibilities regarding the parties' child — were correctly determined as a matter of law. See *id.* at 261-62, 764 A.2d at 1195 (determining whether "the [trial] court abused its discretion by granting [a parent] sole legal and physical custody of the child[ ] based on its findings of fact"). Whereas the trial court's findings concerning several of the other factors favored neither parent, the trial court concluded that father's "misrepresentation of his professional qualifications throughout the marriage calls into question . . . his judgment in providing guidance to his child." See 15 V.S.A. § 665(b)(1). The trial court also concluded:

> [Father's] attempts to justify what is tantamount to an ongoing misrepresentation of his profession calls into question his judgment and trustworthiness when address- ing the child's future developmental needs. . . . His lack of candor on this subject calls into question his ability to assess the child's developmental needs and to respond to those needs with the child's best interest in mind as opposed to his own.

See also *id.* § 665(b)(3). Thus, the trial court's findings reflect its concern regarding father's "ability . . . to provide the child with . . . guidance" as well as his "ability . . . to meet the child's present and future developmental needs." *Id.* § 665(b)(1), (3). The trial court's conclusions that these two factors favored mother reasonably follow its finding that father deceived mother about his professional status for five years.

¶ 12. The fact that the trial court reasonably found that the other § 665 factors weighed equally in favor of each parent is also significant. The court relied on its findings concerning father's deceptiveness to tip an otherwise equal balance, not as a factor that, in a less close case, would outweigh considerations more directly tied to the parents' respective parenting traits. In this particular case, the finding favors the conclusion that it is in the child's best interests that mother have sole parental rights and responsibilities.

¶ 13. ■ Further supporting the trial court's order is its discussion of one more factor, "the quality of the child's relationship with the primary care provider." *Id.* § 665(b)(6). While the trial court did not expressly conclude that this factor favored mother, it did observe that mother has had primary responsibility for the child since the parties' separated and that she played a larger role in caring for the child even prior to the separation. In discussing how the § 665(b) factors should be considered, we have agreed "that this factor should be entitled to great weight unless the primary custodian is unfit." *Harris*, 149 Vt. at 418, 546 A.2d at 214. In the absence of "evidence of the likely effect of the change of custodian on the child . . . the court should ordinarily find that the child should remain with the primary custodian if that parent is fit." *Id.* at 419, 546 A.2d at 214. It is not unreasonable to conclude from this observation that this factor also supports the trial court order granting sole parental rights and responsibilities to mother. None of the other factors favor father. The trial court's conclusions — and therefore the order based on them — are adequately supported by the factual findings. The trial court exercised its discretion in a reasonable manner in light of the evidence. We affirm its custody order.

## II. Property Division

¶ 14. We next turn to the property distribution. The marital assets that are directly relevant to this appeal are: the home jointly owned by the parties, which they purchased and occupied after they married; a house that father owns with his aunt as joint tenants with rights of survivorship; mother's TIAA CREF account; and father's retirement account. Father appeals against the trial court's use of a hypothetical real-estate commission in allocating the marital home; the manner in which the trial court distributed retirement assets earned during the marriage; and the trial court's offset for his anticipated inheritance of his aunt's half-interest in this real estate.

¶ 15. The parties stipulated and the trial court found the value of marital home to be $504,000. The trial court also found that at the time of the property division the parties' equity in the home was $258,055. Based on this figure and its finding that the parties' initial equity in the home was $220,000, the trial court determined that the equity in the home had increased by $38,055. The trial court found that father had contributed $65,000 — a little over

30% — towards the initial equity of that home. The trial court determined that if the home were to be sold the net increase in equity would be only $7,815; it could arrive at this figure by applying a hypothetical real-estate commission of 6% to the stipulated value of the home — $504,000 — and subtracting that commission — $30,240 — from $38,055. The mortgage on the home — the parties' only joint debt — was $245,945.

¶ 16. The trial court accepted the parties' stipulation that the total value of the house father owns with his aunt is $220,000. At the time of the parties' marriage in 2008, mother's TIAA CREF account was valued at $151,152.64. The court found that as of August 2012 the account was worth $296,788.[2] Father's retirement account was valued at $24,980 at the time of marriage, and $25,015 at the beginning of the contested hearing.

¶ 17. The trial court enjoys broad discretion in dividing the marital property, and we will uphold its decision unless that discretion was withheld or abused. *Gravel v. Gravel*, 2009 VT 77, ¶ 16, 186 Vt. 250, 980 A.2d 242; see also 15 V.S.A. § 751(a) (providing that trial court must "equitably divide and assign the property" upon motion by either party). To aid the trial court in allocating the property equitably, the Legislature has provided "guiding criteria" that the trial court may "consider when deciding how to divide a marital estate." *Slade v. Slade*, 2005 VT 39, ¶ 9, 178 Vt. 540, 872 A.2d 367 (mem.) (mentioning factors listed in 15

---

[2] In their briefs, both parties noted an error in the trial court's calculation. In November 2012, partway through the four-day contested hearing, the account was worth $299,682 — an increase in value of $148,530. It appears that in stating its conclusions in its order, the trial court substituted the value of mother's TIAA CREF account at the beginning of the marriage, $151,152, for the increase in its value between the beginning of the marriage and November 2012, $148,530. The difference in these amounts is $2,622, less than 1% of the total value of the TIAA CREF account in November 2012.

We also note where the superior court concluded that mother's retirement account had "experienced an increase in value of approximately $240,000.00 during the marriage." Simple addition and subtraction leads us to understand the trial court to actually mean "approximately $140,000," because adding 140,000 to 151,152 results in a number much closer to 296,788 than adding 240,000 to 151,152.

"[A]n erroneous nonessential finding does not require reversal of the court's property disposition." *Plante v. Plante*, 148 Vt. 234, 237, 531 A.2d 926, 928 (1987). These errors are easily corrected and do not affect the trial court's overall property distribution. Because they are de minimis, the errors are not grounds for reversing the trial court.

V.S.A. § 751(b)). There is no rigid formula for the trial court to use; "[t]he division of property in a divorce proceeding is not an exact science." *Plante*, 148 Vt. at 237, 531 A.2d at 928 (quotation omitted). A disparate property division is not "facially inequitable," and will not be reversed as long as the family court makes adequate findings that are supported by the evidence. *Wade*, 2005 VT 72, ¶ 20.

## A. The Hypothetical Real-Estate Commission

¶ 18. In distributing the parties' property, the trial court awarded the marital home to mother subject to her decision within three months to refinance the mortgage or to list the property for sale with a real-estate broker of her choice. Concluding that father had contributed $65,000 to the initial equity in the marital residence — "approximately 30%" of the initial equity — the trial court determined that father was entitled to a payment of $65,000 plus "30% of any equity in excess of $220,000." The trial court explained that if mother elects to sell the property, the increased equity would be determined by the amount of the net sale proceeds in excess of $220,000; if the net equity from the sale is less than $220,000, father's share would be 30% of those net proceeds.

¶ 19. The trial court ordered the refinancing as an alternative to selling the home. If mother decides to refinance, the trial court initially calculated the increase in equity to be $7,815 by deducting a 6% real-estate commission from the home's stipulated value. See *supra*, ¶ 15. In its order, the trial court determined that if mother decides to refinance, she could calculate the amount of equity she would pay to father by deducting "6% of the agreed upon fair market value" — the real-estate commission — and the costs of refinancing. The trial court made no finding that mother was reasonably likely to sell the property within a reasonable time following the refinance. Because there would be no sale in the refinance scenario, it is illogical to include a sales commission in calculating the amount of equity owed to father in that scenario.

¶ 20. Our rejection of a hypothetical real-estate commission in the scenario described above does not mean that we reject hypothetical commissions outright. In *Hayden v. Hayden*, we accepted the trial court's consideration of a 6% hypothetical real-estate commission to account for a $4,000 overall difference between the divorcing parties' property awards — one spouse

received $82,000 worth of property that included the marital home, while the other received $78,000. 2003 VT 97, ¶ 16, 176 Vt. 52, 838 A.2d 59. In *Hayden*, "the trial court observed that the deduction of a six percent real estate commission for the future sale of the marital home rendered these awards essentially equal." *Id.* (quotation marks omitted). In this case, the trial court's order means that father is entitled to $2,344.50 — 30% of the $7,815 increase in equity after the hypothetical real-estate commission is applied. That amount further decreases after subtracting the costs of refinancing. Mother would keep the remaining amount of the increase in equity, over $35,000. Dividing the marital home's equity in this manner does not result in equal overall property awards.

¶ 21. ▮ We also reject the hypothetical real-estate commission in this scenario because it has the effect of revaluing a specific asset, the equity in the marital home. We permitted the trial court in *Hayden* to consider a hypothetical real-estate commission because it "considered the implications of a hypothetical real estate commission on the overall difference between the property awards *but did not deduct the real estate commission from its valuation of the marital home.*" *Id.* (emphasis added). We reaffirmed the rule that "[p]otential costs such as taxes or commissions cannot affect the valuation of a marital asset." *Id.*; see also *Johnson v. Johnson*, 158 Vt. 160, 165, 605 A.2d 857, 860 (1992) (rejecting "vague and theoretical transactional tax consequences as routine factors in determining fair market value" of assets). The situation here is analogous to the consideration of tax consequences that we rejected in *Drumheller v. Drumheller*, 2009 VT 23, ¶¶ 53-56, 185 Vt. 417, 972 A.2d 176. In *Drumheller*, the trial court awarded most of the marital property to the husband, but also required him to pay half of its value in cash to the wife. *Id.* ¶ 53. The husband argued that because he would have to sell much of the property to comply with the trial court's order, the trial court should have calculated the tax consequences of the sales and adjusted the amount of cash that it awarded to the wife accordingly. *Id.* The trial court determined that in the absence of evidence that any of the property was for sale or likely to be sold, it had no basis for adjusting the amount of the wife's monetary award by factoring in the taxes that potential sales would incur. *Id.* We agreed with the trial court, concluding that "the relief [that the husband] requested was indistinguishable from revaluing

the assets. . . . It would be inappropriate to consider the tax liability on a sale of assets *if no asset is to be sold* . . . ." *Id.* ¶ 56 (emphasis added).

¶ 22. ■ ■ For the same reason that we rejected consideration of potential taxation that was "purely speculative" in *Drumheller*, we conclude that a hypothetical real-estate commission may not be used in this case to reduce the value of father's payout from the increase in the home's equity. *Id.* ¶ 54. Although it may be "particularly appropriate" to consider potential transactional costs "where one spouse retains the marital property and pays off the other spouse's share in cash," the trial court's discretion to do so does not exist where there will be no transaction. *Id.* ¶ 55. Thus, it was beyond the discretion of the trial court to consider a sales commission in the refinancing scenario. Because there would be no sale in the refinancing scenario, the trial court's inclusion of the hypothetical real-estate commission had the effect of directly modifying the value of the asset being awarded. As a result, the computation unbalanced an otherwise equal overall property division. We therefore reverse the application of the hypothetical real-estate commission to the refinancing scenario.

### B. Retirement Assets and the House Co-owned by Father and his Aunt

¶ 23. The trial court awarded father his interest in the house that he co-owns with his aunt. The trial court awarded the TIAA CREF account to mother, but also awarded $17,818 from that account to father "[i]n consideration of the increase in value of [mother's] TIAA CREF account during the marriage . . . and [father's] anticipated receipt of the remaining one half interest ($110,000.00) of the property he currently owns with his aunt."

¶ 24. ■ Because the trial court set off the increase in the value of mother's TIAA CREF account against the anticipated inheritance of his aunt's half-interest in the house he co-owns with her, we consider these two aspects of the appeal together. There is little we need to say beyond reaffirming the well-established principle that distributing the marital estate " 'is not an exact science.' " *Molleur v. Molleur*, 2012 VT 16, ¶ 19, 191 Vt. 202, 44 A.3d 763 (quoting *Victor v. Victor*, 142 Vt. 126, 130, 453 A.2d 1115, 1117 (1982)). The trial court has "wide discretion" in distributing property and "[s]uch distributions are required only to be equi-

table." *Hogel v. Hogel*, 136 Vt. 195, 197, 388 A.2d 369, 370 (1978) (per curiam). Insofar as "[t]he distribution of property does not always lend itself to a precise mathematical formula," equitable property distribution does not require a fifty-fifty division of assets or a penny-by-penny accounting. *Kinley v. Kinley*, 140 Vt. 77, 78, 435 A.2d 698, 699 (1981); see also *Sweeney v. Sweeney*, 136 Vt. 199, 200, 388 A.2d 388, 389 (1978) (per curiam) ("To require precise division would entail liquidation of the marital assets in every contested case, a result often highly disadvantageous to the parties.").

¶ 25. ██ In this case, the trial court expressly contemplated the factors set forth in 15 V.S.A. § 751(b) and crafted its property distribution with those factors in mind. The trial court's conclusions that the marriage was of short duration and that both parties have an opportunity for future income and inheritance of additional assets are relevant to its order awarding the TIAA CREF account to mother and setting off the value of the anticipated inheritance against increases in that account. Furthermore, the parties stipulated not only that the value of the house co-owned by father and his aunt is $220,000, but also that the trial court "shall determine what, if any, weight it shall give this home when determining an equitable allocation of the marital assets." The court weighed father's anticipated receipt of his aunt's interest in the home against the TIAA CREF account's increase in value and awarded him a sum of money from that account. We do not find any grounds for holding that the trial court abused its discretion or that father has shown that "there is no reasonable basis to support" these aspects of the property distribution. *Soutiere v. Soutiere*, 163 Vt. 265, 271, 657 A.2d 206, 209 (1995).

### III. Mother's Cross-Appeal

¶ 26. ██ Mother cross-appeals the trial court's parent-child contact order. We reiterate that the trial court has wide discretion in such matters: "The court has discretion in setting a visitation schedule, and its decision will not be reversed unless that discretion 'was exercised upon unfounded considerations or to an extent clearly unreasonable upon the facts presented.' " *LeBlanc*, 2014 VT 65, ¶ 25 (quoting *Cleverly v. Cleverly*, 151 Vt. 351, 355-56, 561 A.2d 99, 102 (1989)). The trial court initially explained that its goal in creating the schedule was for the parties to share time

with their child and minimize the child's time away from either parent. The trial court devised the schedule to repeat every two months so that father and mother would alternate having weekend time with the child every other month; the schedule allows the child to spend an equal number of days with each parent in an eight-week period. The trial court considered holidays, summer vacations, and birthdays in its schedule, and provided for the child to alternate spending time with each parent at these times.

¶ 27. Mother's cross-appeal challenges the trial court's exercise of its "wide discretion" in considering the evidence submitted by the parties and creating the visitation schedule. *Atwood*, 143 Vt. at 300, 465 A.2d at 1355. Her challenge fails, because "it is for the trial court to weigh the evidence, and we defer to its judgment on appeal." *LeBlanc*, 2014 VT 65, ¶ 26 (citing *Hanson-Metayer*, 2013 VT 29, ¶ 12).

¶ 28. ■ In its entry order denying mother's motion to amend judgment, the trial court acknowledged that achieving a fifty-fifty parent-child contact schedule, while in the child's best interests, is "problematic." Nevertheless, the trial court devised its order in a way that allows the child to spend an equal amount of time with each parent. The trial court determined that a week-on-week-off schedule would be inappropriate because — given the child's age — the time she would be separated from one parent while staying with the other would be too long. In explaining its reasons for rejecting an alternate schedule that mother proposed, the trial court determined that the proposed schedule would involve too many transitions, especially considering its finding that the parties have difficulty communicating with each other. Under mother's proposed schedule, there would be sixteen transitions in an eight-week period; under the trial court's schedule, there are only fourteen. It was within the trial court's discretion to determine that minimizing the number of scheduled transitions outweighs mother's arguments about her work schedule, which rely upon evidence that the trial court did not give great weight. The record reasonably supports the rationale underlying the trial court's ordered schedule, and so we are satisfied that the order was within its discretion.

*Affirmed as to the determination of parental rights and responsibilities, the parent-child contact order, and the award of retirement assets; reversed as to the application of a 6% hypothetical*

*real-estate commission in calculating the amount of equity over $220,000 to which father is entitled in the event that mother decides to refinance.*