2015 VT 64











MacCormack v. MacCormack
(2013-390)

 

2015 VT 64

 

[Filed 17-Apr 2015]

 

NOTICE:  This opinion is
subject to motions for reargument under V.R.A.P. 40 as well as formal revision
before publication in the Vermont Reports.  Readers are requested to
notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by
mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont
05609-0801, of any errors in order that corrections may be made before this
opinion goes to press.

 

 


 
 
 2015 VT 64
 
 


 


 
 
 No. 2013-390
 
 


 


 
 
 Ruth H. MacCormack
 
 
 Supreme Court
 
 
 
 
  
 
 
  
 
 
 
 
  
 
 
 On Appeal from
 
 
 
 
      v.
 
 
 Superior Court, Chittenden
 Unit,
 
 
 
 
  
 
 
 Family Division
 
 
 
 
  
 
 
  
 
 
 
 
 Mark S. MacCormack
 
 
 September Term, 2014
 
 
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
 
 
 Brian
 J. Grearson, J.
 
 
 
 
  
 
 


Mary P. Kehoe of The Kehoe Law Firm, P.C., Burlington, for
Plaintiff-Appellee/

  Cross-Appellant.

 

Lauren S. Kolitch, Waitsfield, for
Defendant-Appellant/Cross-Appellee.

 

 

PRESENT:    Reiber, C.J., Dooley, Skoglund and
Robinson, JJ., and Durkin, Supr. J., 

                    
Specially Assigned

 

 

¶ 1.            
REIBER, C.J.   Father appeals the trial court’s award
of sole legal and physical parental rights and responsibilities to
mother.  Father also appeals the trial court’s calculation and division of
marital assets, challenging the application of a hypothetical real-estate
commission in awarding father a portion of the martial home’s equity as well as
the trial court’s division of the parties’ retirement assets.  Mother cross-appeals
the trial court’s parent–child contact order on the grounds that the order does
not achieve its stated goal and is not in the best interests of the parties’
child.  We affirm the trial court’s order except its application of the
hypothetical real-estate commission in a scenario in which no sale is
contemplated, which we reverse.

¶ 2.            
The parties agree that theirs was a short-term marriage.  Father
and mother met in June 2006, began dating, and married in July 2008.  They
had a child in December 2009.  The marriage suffered a lack of intimacy
throughout its duration.  After the parties attempted marriage counseling,
mother filed for divorce in June 2011.  In October 2011, the trial court
issued a temporary order awarding father and mother shared legal parental
rights and responsibilities but made no order relative to physical parental
rights and responsibilities.  The court ordered fifty–fifty parent–child
contact.  The contested hearing was held over four dates: on August 29 and
November 9 in 2012, and January 14 and March 19 in 2013.  The trial court
issued its factual findings and legal conclusions in July 2013.  It
granted the divorce on the grounds that the parties had lived separately for
more than six months and there was no reasonable probability of resuming the
marital relationship.

¶ 3.            
In reviewing a judgment from the trial court in a divorce proceeding, we
look to whether the trial judge has adequately “explain[ed] the underlying
rationale for its decision, which we will not disturb absent a showing that the
court abused its discretion.”  Billings. v. Billings, 2011 VT 116,
¶ 11, 190 Vt. 487, 35 A.3d 1030 (citing Wade v. Wade, 2005
VT 72, ¶ 13, 178 Vt. 189, 878 A.2d 303).  This standard of
review applies both to awards of parental rights and responsibilities and to
property division.  LeBlanc v. LeBlanc, 2014 VT 65, ¶ 21, ___
Vt. ___, 100 A.3d 345 (“The family court has broad discretion in determining
what allocation of parental rights and responsibilities is in a child's best
interests.”); Atwood v. Atwood, 143 Vt. 298, 300, 465 A.2d 1354, 1355
(1982) (citing 15 V.S.A. § 751) (“Trial courts have wide discretion
. . . in formulating awards of property upon divorce.”).

I. Parental Rights and Responsibilities

 

¶ 4.            
We turn first to the trial court’s determination that mother have sole
parental rights and responsibilities regarding the parties’ child.  “The
trial court has broad discretion in a custody matter, and we must affirm unless
the discretion is ‘erroneously exercised, or was exercised upon unfounded
considerations or to an extent clearly unreasonable in light of the
evidence.’ ”  Myott v. Myott, 149 Vt. 573, 578, 547 A.2d 1336,
1339-40 (1988) (citation omitted); see also Porcaro v. Drop, 175 Vt. 13,
15, 816 A.2d 1280, 1283 (2002) (“Given its unique position to assess the
credibility of witnesses and weigh the evidence, we will not set aside the
family court's findings if supported by the evidence, nor its conclusions if
supported by the findings.” (quotations and alterations omitted)).

¶ 5.            
In determining parental rights and responsibilities, “the court shall be
guided by the best interests of the child.”  15 V.S.A.
§ 665(b).  In determining the best interests of the child, the trial
judge “shall consider at least” the nine factors listed in § 665(b). 
In reviewing a determination of parental rights and responsibilities, we
examine whether “the findings as a whole reflect that the trial court has taken
the statutory factors into consideration, in so far as they are relevant, in
reaching its decision.”  Harris v. Harris, 149 Vt. 410, 414, 546
A.2d 208, 212 (1988) (quoting Rosenfeld v. Rosenfeld, 249 N.W.2d 168,
171-72 (Minn. 1976)).  Although we have not required that the trial court
make its findings in a specific form, we have observed “that it would be
preferable for the trial court to structure its findings and conclusions to
show the findings relevant to each factor together with a conclusion as to each
factor.”  Id.  The trial court did so in this case.

¶ 6.            
In its conclusions of law regarding the parties’ parental rights and
responsibilities, the trial court discussed each factor in turn, restating
relevant findings and making conclusions based upon them.  The trial court
concluded that most of the statutory factors favored neither parent. 
While acknowledging that the parties disagreed over appropriate medical
treatment, the trial court found that both father and mother were able to meet
the child’s material needs and provide a safe environment for her.  See 15
V.S.A. § 665(b)(2).  The trial court found that a change in either
parent’s residence would not be a factor in its decision and concluded that the
child’s adjustment to her housing, school, and community did not favor one
parent or the other.  See id. § 665(b)(4).  With regard to the
parties’ abilities to foster positive relationships and ongoing contact between
the child and one another, the trial court acknowledged the difficulty that
mother and father have communicating with each other and concluded that this
factor also favored neither parent.  See id. § 665(b)(5).  The
trial court concluded that the child’s relationships with other people who
might significantly affect her, such as her extended family, also favored neither
father nor mother.  See id. § 665(b)(7).  The trial court
explained why the parties’ ability to communicate, cooperate, and make joint
decisions was not a relevant factor in its decision, as they could not agree to
share custody.  See id. § 665(b)(8).  Likewise, as there was
no evidence of abuse, the trial court explained that this was not a relevant
factor in determining who should have sole parental rights and
responsibility.  See id. § 665(b)(9).  When considered
together, these determinations reflect that the case was a close one.

¶ 7.            
Ultimately, the trial court’s findings regarding the parents’ ability
and disposition to provide guidance to the child and to meet her developmental
needs tipped the balance in favor of a determination that mother should have
sole parental rights and responsibilities.  See id.
§ 665(b)(1), (3).  Prior to meeting mother, father successfully
completed a four-year law-office clerkship that qualified him to seek admission
to the Vermont bar.  He never sat for the Vermont bar exam, however, and
so never became qualified to practice law.  The trial court found that
father allowed mother to mistakenly believe he was a fully-qualified
“attorney,” and that in the five years that elapsed between their meeting and
divorce, father never corrected mother’s mistaken impression.  The trial
court rooted this finding in evidence pertaining to father’s lack of candor and
the failure to correct mother’s impression of his professional status during
their marriage.  Thus, his actual professional status remained undisclosed
until after divorce proceedings began.

¶ 8.            
In making these findings, the trial court referred to evidence that
father misrepresented his professional status to mother.  The trial court
noted that whether father misrepresented his professional status to mother
during the marriage gave rise to “substantial conflicting testimony.” 
Nevertheless, the trial court found that testimony from father’s witness
offered to rebut mother’s lack of knowledge regarding his actual professional
status was not credible.  We defer to the trial court’s credibility
assessment that favored mother’s version of events.  Hanson-Metayer v.
Hanson-Metayer, 2013 VT 29, ¶ 12, 193 Vt. 490, 70 A.3d 1036; see also Porcaro,
175 Vt. at 15, 816 A.2d at 1283 (acknowledging trial court’s “unique position
to assess the credibility of witnesses”).  Mother supported her testimony
by offering as an exhibit her and father’s wedding announcement, which reads:
“[Father] is a tax attorney.  He received . . . his law degree from Western New
England College, School of Law.”  Neither statement is true.  Father
testified that he did not take steps to correct the impression because he is
not from the town where the announcement was published and lives far away from
it.  Absent any credible evidence that mother knew father was not a
fully-qualified attorney, it is uncontroverted that father never corrected
mother’s mistaken impression during their marriage.

¶ 9.            
Father has challenged the trial court’s findings by arguing that he did
not misrepresent his professional status to mother because, in his view, while
he may not be a fully-qualified “attorney,” he may nonetheless still call
himself a “lawyer.”  He maintains that it was appropriate for him to refer
to himself as a “lawyer” throughout the marriage and suggests that he did not
need to correct the impression he gave mother that he was something other than
a fully-accredited attorney.[1] 
The trial court’s determination does not rely upon father’s semantic
assertions, however, but rather upon its findings regarding the child’s best
interests—one of which was that he allowed mother to believe things about
himself that were not true.

¶ 10.        
The critical issue is not whether father can accurately call himself an
“attorney”; it is whether he deceived mother both with overt misrepresentations
and with misrepresentations made by omission.  The trial court
acknowledged that father believes there is a difference between a “lawyer” and
an “attorney” and unilaterally decided not to discuss the difference with
mother.  According to the trial court, father’s decision to allow mother
to persist in her mistaken impression went “beyond not wanting to get into the
‘nuances’ between an attorney and a lawyer.”  The trial court determined
that father “allow[ed] what may have been an initial misunderstanding by the
plaintiff to evolve into on-going deception.”  In the context of their
relationship and the personal commitments they made to each other through the
bonds of marriage, the trial court essentially found that father lied about his
identity.  Based on this finding, the trial court concluded that it would
be more appropriate for mother to exercise sole parental rights and
responsibilities for the parties’ child.  The finding is “supported by the
record evidence” and we see no clear error in it.  See Hoover
(Letourneau) v. Hoover, 171 Vt. 256, 261, 764 A.2d 1192, 1195 (2000)
(reviewing trial court’s findings of fact for clear error).

¶ 11.        
As there is no clear error in the trial court’s findings, we turn to
whether its conclusions and judgment—that mother should have sole parental
rights and responsibilities regarding the parties’ child—were correctly determined
as a matter of law.  See id. at 261-62, 764 A.2d at 1195
(determining whether “the [trial] court abused its discretion by granting [a
parent] sole legal and physical custody of the child[] based on its findings of
fact”).  Whereas the trial court’s findings concerning several of the
other factors favored neither parent, the trial court concluded that father’s
“misrepresentation of his professional qualifications throughout the marriage
calls into question . . . his judgment in providing guidance to his
child.”  See 15 V.S.A. § 665(b)(1).  The trial court also concluded,

[Father’s] attempts to justify what is
tantamount to an ongoing misrepresentation of his profession calls into
question his judgment and trustworthiness when addressing the child’s future
developmental needs.  . . .  His lack of candor on this
subject calls into question his ability to assess the child’s developmental
needs and to respond to those needs with the child’s best interest in mind as
opposed to his own.

See also id. § 665(b)(3). 
Thus, the trial court’s findings reflect its concern regarding father’s
“ability . . . to provide the child with . . . guidance” as well
as his “ability . . . to meet the child’s present and future
developmental needs.”  Id. § 665(b)(1), (3).  The trial
court’s conclusions that these two factors favored mother reasonably follow its
finding that father deceived mother about his professional status for five
years.

¶ 12.        
The fact that the trial court reasonably found that the other § 665
factors weighed equally in favor of each parent is also significant.  The
court relied on its findings concerning father’s deceptiveness to tip an
otherwise equal balance, not as a factor that, in a less close case, would
outweigh considerations more directly tied to the parents’ respective parenting
traits.  In this particular case, the finding favors the conclusion that
it is in the child’s best interests that mother have sole parental rights and
responsibilities.

¶ 13.        
Further supporting the trial court’s order is its discussion of one more
factor, “the quality of the child’s relationship with the primary care
provider.”  Id. § 665(b)(6).  While the trial court did not
expressly conclude that this factor favored mother, it did observe that mother
has had primary responsibility for the child since the parties’ separated and
that she played a larger role in caring for the child even prior to the
separation.  In discussing how the § 665(b) factors should be
considered, we have agreed “that this factor should be entitled to great weight
unless the primary custodian is unfit.”  Harris, 149 Vt. at 418,
546 A.2d at 214.  In the absence of “evidence of the likely effect of the
change of custodian on the child . . . the court should ordinarily
find that the child should remain with the primary custodian if that parent is
fit.”  Id. at 419, 546 A.2d at 214.  It is not unreasonable to
conclude from this observation that this factor also supports the trial court
order granting sole parental rights and responsibilities to mother. None of the
other factors favor father.  The trial court’s conclusions—and therefore
the order based on them—are adequately supported by the factual findings. 
The trial court exercised its discretion in a reasonable manner in light of the
evidence.  We affirm its custody order.

II.    
Property Division

¶ 14.        
We next turn to the property distribution.  The marital assets that
are directly relevant to this appeal are: the home jointly owned by the
parties, which they purchased and occupied after they married; a house that
father owns with his aunt as joint tenants with rights of survivorship;
mother’s TIAA CREF account; and father’s retirement account.  Father
appeals against the trial court’s use of a hypothetical real-estate commission
in allocating the marital home; the manner in which the trial court distributed
retirement assets earned during the marriage; and the trial court’s offset for
his anticipated inheritance of his aunt’s half-interest in this real estate.

¶ 15.        
The parties stipulated and the trial court found the value of marital
home to be $504,000.  The trial court also found that at the time of the
property division, the parties’ equity in the home was $258,055.  Based on
this figure and its finding that the parties’ initial equity in the home was
$220,000, the trial court determined that the equity in the home had increased
by $38,055.  The trial court found that father had contributed $65,000—a
little over 30%—towards the initial equity of that home.  The trial court
determined that if the home were to be sold, the net increase in equity would
be only $7,815; it could arrive at this figure by applying a hypothetical
real-estate commission of 6% to the stipulated value of the home—$504,000—and
subtracting that commission—$30,240—from $38,055.  The mortgage on the
home—the parties’ only joint debt—was $245,945.  

¶ 16.        
The trial court accepted the parties’ stipulation that the total value
of the house father owns with his aunt is $220,000.  At the time of the
parties’ marriage in 2008, mother’s TIAA CREF account was valued at
$151,152.64.  The court found that as of August 2012, the account was
worth $296,788.[2] 
Father’s retirement account was valued at $24,980 at the time of marriage, and
$25,015 at the beginning of the contested hearing.

¶ 17.        
The trial court enjoys broad discretion in dividing the marital
property, and we will uphold its decision unless that discretion was withheld
or abused.  Gravel v. Gravel, 2009 VT 77, ¶ 16, 186 Vt. 250,
980 A.2d 242; see also 15 V.S.A. § 751(a) (providing that trial court must
“equitably divide and assign the property” upon motion by either party).  To aid the trial court in allocating the property equitably,
the legislature has provided “guiding criteria” that the trial court may
“consider when deciding how to divide a marital estate.”  Slade v.
Slade, 2005 VT 39, ¶ 9, 178 Vt. 540, 872 A.2d 367 (mem.) (mentioning
factors listed in 15 V.S.A. § 751(b)).  There is no rigid formula for
the trial court to use; “[t]he division of property in a divorce proceeding is
not an exact science.”  Plante, 148 Vt. at 237, 531 A.2d at 928
(quotation omitted).  A disparate property division is not “facially
inequitable,” and will not be reversed as long as the family court makes
adequate findings that are supported by the evidence.  Wade,
2005 VT 72, ¶ 20.

A.    
The Hypothetical Real-Estate Commission

¶ 18.        
In distributing the parties’ property, the trial court awarded the
marital home to mother subject to her decision within three months to refinance
the mortgage or to list the property for sale with a real-estate broker of her
choice.  Concluding that father had contributed $65,000 to the initial
equity in the marital residence—“approximately 30%” of the initial equity—the
trial court determined that father was entitled to a payment of $65,000 plus
“30% of any equity in excess of $220,000.”  The trial court explained that
if mother elects to sell the property, the increased equity would be determined
by the amount of the net sale proceeds in excess of $220,000; if the net equity
from the sale is less than $220,000, father’s share would be 30% of those net
proceeds.

¶ 19.        
The trial court ordered the refinancing as an alternative to selling the
home.  If mother decides to refinance, the trial court initially
calculated the increase in equity to be $7,815 by deducting a 6% real-estate
commission from the home’s stipulated value.  See supra, ¶
15.  In its order, the trial court determined that if mother decides to
refinance, she could calculate the amount of equity she would pay to father by
deducting “6% of the agreed upon fair market value”—the real estate
commission—and the costs of refinancing.  The trial court made no finding
that mother was reasonably likely to sell the property within a reasonable time
following the refinance.  Because there would be no sale in the refinance
scenario, it is illogical to include a sales commission in calculating the
amount of equity owed to father in that scenario.

¶ 20.        
Our rejection of a hypothetical real-estate commission in the scenario
described above does not mean that we reject hypothetical commissions
outright.  In Hayden v. Hayden, we accepted the trial court’s
consideration of a 6% hypothetical real-estate commission to account for a
$4,000 overall difference between the divorcing parties’ property awards—one
spouse received $82,000 worth of property that included the marital home, while
the other received $78,000.  2003 VT 97, ¶ 16, 176 Vt. 52, 838 A.2d 59.
 In Hayden, “the trial court observed that the deduction of a six
percent real estate commission for the future sale of the marital home rendered
these awards essentially equal.”  Id. (quotation marks omitted).
 In this case, the trial court’s order means that father is entitled to
$2,344.50—30% of the $7,815 increase in equity after the hypothetical
real-estate commission is applied.  That amount further decreases after
subtracting the costs of refinancing.  Mother would keep the remaining
amount of the increase in equity, over $35,000.  Dividing the marital
home’s equity in this manner does not result in equal overall property awards.

¶ 21.        
We also reject the hypothetical real-estate commission in this scenario
because it has the effect of revaluing a specific asset, the equity in the
marital home.  We permitted the trial court in Hayden to consider a
hypothetical real-estate commission because it “considered the implications of
a hypothetical real estate commission on the overall difference between the
property awards but did not deduct the real estate commission from its
valuation of the marital home.”  Id. (emphasis added).  We
reaffirmed the rule that “[p]otential costs such as taxes or commissions cannot
affect the valuation of a marital asset.”  Id.; see also Johnson
v. Johnson, 158 Vt. 160, 164-65, 605 A.2d 857, 860 (1992) (rejecting “vague
and theoretical transactional tax consequences as routine factors in
determining fair market value” of assets).  The situation here is analogous
to the consideration of tax consequences that we rejected in Drumheller v.
Drumheller, 2009 VT 23, ¶¶ 53-56, 185 Vt. 417, 972 A.2d 176.  In Drumheller,
the trial court awarded most of the marital property to the husband, but also
required him to pay half of its value in cash to the wife.  Id.
¶ 53.  The husband argued that because he would have to sell much of
the property to comply with the trial court’s order, the trial court should
have calculated the tax consequences of the sales and adjusted the amount of
cash that it awarded to the wife accordingly.  Id.  The trial
court determined that in the absence of evidence that any of the property was
for sale or likely to be sold, it had no basis for adjusting the amount of the
wife’s monetary award by factoring in the taxes that potential sales would
incur.  Id.  We agreed with the trial court, concluding that
“the relief [that the husband] requested was indistinguishable from revaluing
the assets.  . . .  It would be inappropriate to consider the tax liability
on a sale of assets if no asset is to be sold.”  Id.
¶ 56 (emphasis added).

¶ 22.        
For the same reason that we rejected consideration of potential taxation
that was “purely speculative” in Drumheller, we conclude that a
hypothetical real-estate commission may not be used in this case to reduce the
value of father’s payout from the increase in the home’s equity.  Id.
¶ 54.  Although it may be “particularly appropriate” to consider
potential transactional costs “where one spouse retains the marital property
and pays off the other spouse's share in cash,” the trial court’s discretion to
do so does not exist where there will be no transaction.  Id.
¶ 55.  Thus, it was beyond the discretion of the trial court to
consider a sales commission in the refinancing scenario.  Because there
would be no sale in the refinancing scenario, the trial court’s inclusion of
the hypothetical real-estate commission had the effect of directly modifying
the value of the asset being awarded.  As a result, the computation
unbalanced an otherwise equal overall property division.  We therefore
reverse the application of the hypothetical real-estate commission to the
refinancing scenario.

B.    
Retirement Assets and the House Co-owned by Father and his Aunt

¶ 23.        
The trial court awarded father his interest in the house that he co-owns
with his aunt.  The trial court awarded the TIAA CREF account to mother,
but also awarded $17,818 from that account to father “[i]n consideration of the
increase in value of [mother’s] TIAA CREF account during the marriage
. . . and [father’s] anticipated receipt of the remaining one half
interest ($110,000.00) of the property he currently owns with his aunt.”  

¶ 24.        
Because the trial court set off the increase in the value of mother’s
TIAA CREF account against the anticipated inheritance of his aunt’s
half-interest in the house he co-owns with her, we consider these two aspects
of the appeal together.  There is little we need to say beyond reaffirming
the well-established principle that distributing the marital estate “is not an
exact science.”  Molleur v. Molleur, 2012 VT 16, ¶ 19, 191 Vt.
202, 44 A.3d 763 (quoting Victor v. Victor, 142 Vt. 126, 130, 453 A.2d
1115, 1117 (1982)).  The trial court has “wide discretion” in distributing
property and “[s]uch distributions are required only to be equitable.”  Hogel
v. Hogel, 136 Vt. 195, 197, 388 A.2d 369, 370 (1978) (per curiam). 
Insofar as “[t]he distribution of property does not always lend itself to a
precise mathematical formula,” equitable property distribution does not require
a fifty-fifty division of assets or a penny-by-penny accounting.  Kinley
v. Kinley, 140 Vt. 77, 78, 435 A.2d 698, 699 (1981); see also Sweeney v.
Sweeney, 136 Vt. 199, 200, 388 A.2d 388, 389 (1978) (per curiam) (“To
require precise division would entail liquidation of the marital assets in
every contested case, a result often highly disadvantageous to the parties.”).

¶ 25.        
In this case, the trial court expressly contemplated the factors set
forth in 15 V.S.A. § 751(b) and crafted its property distribution with those
factors in mind.  The trial court’s conclusions that the marriage was of
short duration and that both parties have an opportunity for future income and
inheritance of additional assets are relevant to its order awarding the TIAA
CREF account to mother and setting off the value of the anticipated inheritance
against increases in that account.  Furthermore, the parties stipulated
not only that the value of the house co-owned by father and his aunt is
$220,000, but also that the trial court “shall determine what, if any, weight
it shall give this home when determining an equitable allocation of the marital
assets.”  The court weighed father’s anticipated receipt of his aunt’s
interest in the home against the TIAA CREF account’s increase in value and
awarded him a sum of money from that account.  We do not find any grounds
for holding that the trial court abused its discretion or that father has shown
that “there is no reasonable basis to support” these aspects of the property
distribution.  Soutiere v. Soutiere, 163 Vt. 265, 271, 657 A.2d
206, 209 (1995).  

 

 

III.   Mother’s
Cross-Appeal

 

¶ 26.        
Mother cross-appeals the trial court’s parent–child contact order. 
We reiterate that the trial court has wide discretion in such matters: “The
court has discretion in setting a visitation schedule, and its decision will
not be reversed unless that discretion ‘was exercised upon unfounded
considerations or to an extent clearly unreasonable upon the facts
presented.’ ” LeBlanc, 2014 VT 65, ¶ 25 (quoting Cleverly
v. Cleverly, 151 Vt. 351, 355–56, 561 A.2d 99, 102 (1989)).  The trial
court initially explained that its goal in creating the schedule was for the
parties to share time with their child and minimize the child’s time away from
either parent.  The trial court devised the schedule to repeat every two
months so that father and mother would alternate having weekend time with the
child every other month; the schedule allows the child to spend an equal number
of days with each parent in an eight-week period.  The trial court
considered holidays, summer vacations, and birthdays in its schedule, and
provided for the child to alternate spending time with each parent at these
times.  

¶ 27.        
Mother’s cross-appeal challenges the trial court’s exercise of its “wide
discretion” in considering the evidence submitted by the parties and creating
the visitation schedule.  Atwood, 143 Vt. at 300, 465 A.2d at
1355.  Her challenge fails, because “it is for the trial court to weigh
the evidence, and we defer to its judgment on appeal.”  LeBlanc,
2014 VT 65, ¶ 26 (citing Hanson-Metayer, 2013 VT 29, ¶ 12).

¶ 28.        
In its entry order denying mother’s motion to amend judgment, the trial
court acknowledged that achieving a fifty–fifty parent–child contact schedule,
while in the child’s best interests, is “problematic.”  Nevertheless, the
trial court devised its order in a way that allows the child to spend an equal
amount of time with each parent.  The trial court determined that a
week-on-week-off schedule would be inappropriate because—given the child’s
age—the time she would be separated from one parent while staying with the
other would be too long.  In explaining its reasons for rejecting an
alternate schedule that mother proposed, the trial court determined that the
proposed schedule would involve too many transitions, especially considering
its finding that the parties have difficulty communicating with each
other.  Under mother’s proposed schedule, there would be sixteen
transitions in an eight-week period; under the trial court’s schedule, there
are only fourteen.  It was within the trial court’s discretion to
determine that minimizing the number of scheduled transitions outweighs mother’s
arguments about her work schedule, which rely upon evidence that the trial
court did not give great weight.  The record reasonably supports the
rationale underlying the trial court’s ordered schedule, and so we are
satisfied that the order was within its discretion.

Affirmed as to the
determination of parental rights and responsibilities, the parent–child contact
order, and the award of retirement assets; reversed as to the application of a
6% hypothetical real-estate commission in calculating the amount of equity over
$220,000 to which father is entitled in the event that mother decides to
refinance. 

 


 
 
  
 
 
  
 
 
 FOR THE COURT:
 
 
 
 
  
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 
 
 
  
 
 
  
 
 
 Chief
 Justice
 
 


 














[1]
 Without acknowledging the merits of father’s argument, the trial court
stated in dicta that “many individuals attend and graduate from law school who
do not become practicing attorneys but are entitled to refer to themselves as
lawyers.  Nevertheless, one year of law school does not a lawyer make.” 
We note that the Rules of Admission to the Bar of the Vermont Supreme Court do
not require applicants to attend an accredited law school; someone who
successfully completes a four-year office study would be in the same position
as a law-school graduate with regard to eligibility to sit for the Vermont bar
exam.  See Rules of Admission § 6(g).  Our rules require each
candidate to successfully pass the bar exam as well as a Character and Fitness
Committee review before they may be regarded as a Vermont-licensed
attorney.  Id. §§ 6(a), 12.





[2] 
In their briefs, both parties noted an error in the trial court’s
calculation.  In November 2012, partway through the four-day contested
hearing, the account was worth $299,682—an increase in value of $148,530. 
It appears that in stating its conclusions in its order, the trial court
substituted the value of mother’s TIAA CREF account at the beginning of the
marriage, $151,152, for the increase in its value between the beginning of the
marriage and November 2012, $148,530.  The difference in these amounts is
$2,622, less than 1% of the total value of the TIAA CREF account in November
2012.  

 

We also note where the superior court concluded that
mother’s retirement account had “experienced an increase in value of
approximately $240,000.00 during the marriage.”  Simple addition and
subtraction leads us to understand the trial court to actually mean
“approximately $140,000,” because adding 140,000 to 151,152 results in a number
much closer to 296,788 than adding 240,000 to 151,152. 

 

“[A]n erroneous nonessential finding does not require
reversal of the court's property disposition.”  Plante v. Plante,
148 Vt. 234, 237, 531 A.2d 926, 928 (1987).  These errors are easily
corrected and do not affect the trial court’s overall property distribution.
 Because they are de minimis, the errors are not grounds for reversing the
trial court.